**Edward Earl WILLIAMS, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 45S00–9210–DP–770.**

Supreme Court of Indiana.

Aug. 7, 1996.

Rehearing Denied Dec. 23, 1996.

Charles E. Stewart, Jr., Darnail Lyles, Crown Point, for appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for appellee.

## ON DIRECT APPEAL

SULLIVAN, Justice.

We review and affirm the murder convictions and death sentence of defendant Edward Earl Williams.

### Background

In the early morning hours of June 19, 1992, defendant, armed with a handgun, Jemelle Joshua, armed with a shotgun, and three others set out to steal audio and video equipment from the basement of school teacher Michael Richardson. Defendant and Joshua were admitted to Richardson's home and their three accomplices followed them in. Besides Richardson, they encountered a number of children and adults, including

Richardson's sister, Debra Rice, and Robert Hollins. While defendant held his gun to Richardson's head and Joshua held Rice, their accomplices headed for the basement. Hollins intercepted them and began to wrestle with one of them in the kitchen. Defendant responded by shooting Hollins in the back.

The electronic equipment proved too difficult to remove and the defendant ordered the occupants of the house to lie down. Rice attempted to escape and Joshua shot her in the chest. As the invaders left the home, defendant shot each of Hollins, Rice and Richardson once in the head despite Richardson's plea, "Please don't kill me." A few hours later, defendant would tell his sister that he shot the victims so there wouldn't be any witnesses.

Defendant was charged with the murder[1] and felony murder[2] of each of Robert Hollins, Debra Rice and Michael Richardson. The state also sought the death penalty, alleging as aggravating circumstances that the defendant intentionally killed each of the three victims while committing or attempting to commit robbery[3] and murdered two or more persons by knowingly or intentionally killing the three victims.[4]

The trial commenced on January 25, 1993. On January 29, the jury found the defendant guilty on all six counts of murder. On January 30, the trial court commenced the penalty phase of the defendant's trial. After extensive deliberation, the jury indicated that they were unable to reach a unanimous recommendation as to whether the trial court should impose the death sentence and was discharged without making a recommendation.

Following completion of the pre-sentence investigation, the trial court conducted a sentencing hearing on February 26. On March 2, the trial court sentenced the defendant to death.

*Issues on Appeal*

In addition to issues specifically challenging the imposition of a sentence of death, to be discussed under "Death Sentence Review" below, defendant raises four issues on appeal.

1. *Trial Court Denial of Peremptory Challenges.*

Defendant contends that it was reversible error for the trial court to deny defendant the exercise of peremptory challenges to four prospective jurors.

During *voir dire,* the trial court imposed upon both parties a requirement that, in order to exercise a peremptory challenge, the party attempting the challenge must give to the court a race, ethnic, religious, sex-neutral reason for the challenge. Thus, when defendant attempted to exercise peremptory challenges to strike certain members of the venire, the trial court demanded a race-neutral explanation even though the prosecution did not object to the defense's attempt to use these peremptory challenges. In the case of several prospective jurors, the trial court found defense counsel's explanation inadequate and refused to excuse them. We will return to the details of this procedure after reviewing the applicable legal principles and precedents.

a. *Applicable Legal Principles.*

When the trial court *sua sponte* required the defendant to present a race-neutral explanation for each peremptory strike, we perceive three separate legal principles being implicated—*Batson* principles, peremptory challenge principles, and trial management principles. In this context, these three sets of principles stand in uneasy balance with each other.

In *Batson v. Kentucky,* 476 U.S. 79, 96, 106 S.Ct. 1712, 1722–23, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Fourteenth Amendment's Equal Protection Clause precluded the state from using peremptory challenges to exclude prospective

---

[1]. Ind.Code § 35–42–1–1(1) (1991 Supp.).

[2]. Ind.Code § 35–42–1–1(2) (1991 Supp.).

[3]. Ind.Code § 35–50–2–9(b)(1)(G) (1991 Supp.).

[4]. Ind.Code § 35–50–2–9(b)(8) (1991 Supp.).

African–American jurors because of their race in a criminal case with an African–American defendant. The Supreme Court subsequently forbade the use of peremptory challenges (i) by prosecutors to strike prospective African–African jurors because of their race in a criminal case where the defendant was white, *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); (ii) by either party to strike prospective jurors because of their race in civil cases, *Edmonson v. Leesville Concrete, Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); (iii) by a white defendant to strike prospective African–American jurors because of their race in a criminal case, *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)[5]; and (iv) by the state to strike prospective male jurors because of their gender in a paternity and child support case against a putative father, *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

■ While *Batson* itself appeared to be based upon the right of the criminal defendant to a trial free of racial taint, the doctrine has evolved into one designed to protect the right of the prospective juror to serve. In *McCollum,* the Supreme Court said that while citizens have no right to sit on a particular petit jury, they do have a right not to be excluded from jury service on the basis of race. 505 U.S. at 47–49, 112 S.Ct. at 2353 (citing *Powers,* 499 U.S. at 409–10, 111 S.Ct. at 1370). The *McCollum* court also noted that irrespective of who exercises a discriminatory challenge, "the harm is the same—in all cases, the juror is subjected to open and public racial discrimination." 505 U.S. at 49, 112 S.Ct. at 2353. Whether a discriminatory challenge is invoked by the defense or the state, if a trial court allows prospective jurors to be precluded from jury service on the basis of race, "it is a willing participant in a scheme that could only undermine the very foundation our system of justice—our citizens' confidence in it." *Id.* at 49–50, 112 S.Ct. at 2354. Further, the *J.E.B.* court recognized "that whether the trial is criminal

or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." 511 U.S. at ——, 114 S.Ct. at 1421 (citing *Powers,* 499 U.S. at 400, 111 S.Ct. at 1364; *Edmonson,* 500 U.S. at 614, 111 S.Ct. at 2079; *McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33).

■ We distill from these comments by the United States Supreme Court that *Batson* and its progeny protect the constitutional right to equal protection under the law of both defendants and prospective jurors, *i.e.,* the right that a prospective juror will not be excluded from service on the basis of race or gender.

But even while these *Batson* principles highlight certain rights of jurors, peremptory challenges remain. Our rules require that peremptory challenges be available to each side. Ind.Trial Rule 47(C). Our legislature has expressed its desire that peremptory challenges be available in all criminal jury trials. Ind.Code § 35–37–1–3 (1988). In *J.E.B.,* Justice O'Connor expressed her view that the "peremptory challenge remains an important litigator's tool." 511 U.S. at ——, 114 S.Ct. at 1431 (O'Connor, J., concurring). And in *Batson* itself, in response to Justice Marshall's suggestion that peremptory challenges should be abolished entirely, the majority said:

> [T]his Court may assume that trial judges, in supervising *voir dire* in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination. Nor do we think that this historic trial practice which long has served the selection of an impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution.

*Batson,* 476 U.S. at 99 n. 22, 106 S.Ct. at 1724 n. 22 (emphasis added).

---

5. *See also Georgia v. Carr,* 262 Ga. 893, 427 S.E.2d 273 (1993) (*per curiam* ) (after *cert.* granted and remand, 506 U.S. 801, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992)), where the Georgia Supreme

Court held that *McCollum* forbids the use of peremptory challenges by African–American defendants to strike prospective white jurors because of their race in criminal cases.

The third set of principles affecting this question relates to the authority enjoyed by Indiana trial courts in managing criminal trials. We have frequently commented on the trial court's duty to "manage and control" the proceedings which are conducted before it and the "wide latitude of discretion" which the trial court has in carrying out its duties. *See, e.g., Garcia v. State*, 517 N.E.2d 402, 405 (Ind.1988); *Cornett v. State*, 450 N.E.2d 498, 505 (Ind.1983); *Pitman v. State*, 436 N.E.2d 74, 78 (Ind.1982); *Lawson v. State*, 274 Ind. 419, 431, 412 N.E.2d 759, 768 (1980). In addition to this general responsibility, T.R. 47(D) gives the court broad authority to examine prospective jurors. *See also Stamps v. State*, 515 N.E.2d 507, 509 (Ind.1987) (citing *Hall v. State*, 497 N.E.2d 916 (Ind.1986)). But although a trial judge may intervene in the fact-finding process and question witnesses in order to promote clarity or dispel obscurity, the trial judge may not assume an adversarial role in the proceedings. *Isaac v. State*, 605 N.E.2d 144, 148 (Ind.1992); *Fox v. State*, 497 N.E.2d 221, 227 (Ind.1986). *See also Brannum v. State*, 267 Ind. 51, 57, 366 N.E.2d 1180, 1182 (1977). In fact, to the extent that intervention by the trial court in the proceedings would constitute exercising the prosecutorial function, it would violate the separation of powers or functions article of the Indiana constitution. Ind. Const. Art. III, § 1; *see generally Isaac v. State*, 605 N.E.2d at 146.

The question of whether it was appropriate for the trial court to *sua sponte* require race-neutral justifications for defendant's peremptory challenges, then, requires a balancing of (i) the trial court's inherent authority to manage and control proceedings generally, and to supervise *voir dire* in particular, and to remain impartial and eschew advocacy, (ii) the cherished role of the peremptory challenge in assuring the selection of a qualified and unbiased jury, and (iii) the equal protection right of potential jurors, as well as litigants, to jury selection procedures that are free from racial or gender bias.

b. *Relevant Cases.*

While we have not had occasion to analyze the interplay of these principles, both the Indiana Court of Appeals and the United States Court of Appeals for the Seventh Circuit have. In *Pfister v. State*, 650 N.E.2d 1198 (Ind.Ct.App.1995), the court confronted an appeal from theft and marijuana possession convictions where the trial court required "parties wishing to exercise peremptory challenges [to] approach the bench and justify their [peremptory] challenges based upon" *Batson* and *J.E.B.* Defense counsel sought to strike a prospective juror, approached the bench, and used as the *Batson/J.E.B.* justification that the individual had been on the school board, "was very curt with his answers," "[d]idn't want to look the defendant in the eye, and didn't want to look [defense counsel] directly in the eye." The prosecution did not object to or challenge counsel's attempted removal of the juror. The trial court rejected the justification on grounds that it did not "[s]how some sort of conjunction to this case." *Id.* at 1199.

Judge Barteau, writing for the Court of Appeals, found reversible error. Citing the importance of peremptory challenges in Indiana, the appellate court took the position that a trial court can only override the automatic operation of a peremptory strike by strict adherence to *Batson/J.E.B. procedures:*

In raising a *Batson* or *J.E.B.* objection, the burden is on the opposing party to demonstrate that its opponent is attempting to remove a juror based solely upon race or gender. Once a prima facie showing has been made, the burden shifts to the party exercising the peremptory challenge to provide a neutral explanation for removing the juror.

. . .

Under the directions of the trial court's Voir Dire Order, [defendant] was required to provide an explanation for every peremptory challenge, regardless of whether the prosecution raised a *Batson* or *J.E.B.* objection. The prosecution was required to make no prima facie showing of race or gender discrimination. Rather, the burden was wrongfully placed upon [defendant] to justify every exercise of his peremptory challenges. And, the court denied [defendant's] peremptory challenge when he did not provide an explanation

that the court deemed satisfactory, despite the fact that Pfister's explanation included no implications of race or gender.

*Id.* at 1199–1200.

In *Doe v. Burnham,* plaintiff who was subjected to a strip search brought a civil rights action against city police officers. The federal district court disallowed a peremptory challenge, even though the opposing party made no *Batson* objection. Judge Manion, writing for the Seventh Circuit, observed:

> Under *Batson,* a court should at least wait for an objection before intervening in the process of jury selection to set aside a peremptory challenge. Tradition engraves the process of peremptory challenges into our system; it is "a procedure which has been part of our common law for many centuries and part of our jury system for nearly 200 years." *Batson,* 476 U.S. at 112, 106 S.Ct. at 1731 (Burger, J., dissenting). Judges should invade a party's discretion to strike potential jurors only in narrow circumstances.

*Doe v. Burnham,* 6 F.3d 476, 481 (7th Cir. 1993) (some citations omitted).

Other jurisdictions have come out differently, instead embracing the notion that a trial court may *sua sponte* raise a *Batson* objection to the exercise of a peremptory challenge. *Richardson v. State,* 575 So.2d 294 (Fla.Dist.Ct.App.1991) (trial court could properly raise issue of whether State could justify excluding some minority venire members); *Brogden v. State,* 102 Md.App. 423, 649 A.2d 1196 (1994) ("trial judge need not sit idly by when he or she observes what he perceives to be discrimination in the exercise of peremptory challenges"); *People v. Nelson,* 214 A.D.2d 411, 625 N.Y.S.2d 176 (1995) (trial court did not improperly inject itself into proceedings by *sua sponte* noting existence of *prima facie Batson* violation); *American Home Assurance Co. v. National Casualty Co.,* 209 A.D.2d 291, 618 N.Y.S.2d 719 (1994) (record supported trial court's *sua sponte* determination of existence of prima facie showing of gender discrimination). *See also Trammel v. State,* 265 Ga. 156, 454 S.E.2d 501, 503 (1995) (finding a *Batson*

hearing that was *sua sponte* conducted by the trial court unobjectionable).

**c.** *This Case.*

■ We do not find that it constituted reversible error for the trial court to require each side to present a race-neutral justification for each of its peremptory challenges. We acknowledge that it cuts against the remaining vitality which peremptory challenges enjoy for the trial court to demand a race-neutral justification before there has been any *prima facie* showing that the peremptory challenge has been made on the basis of race. But post-*Batson/J.E.B.* jurisprudence recognizes that potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from racial and gender bias. We conclude that it was within the discretion trial courts enjoy to manage and control the proceedings to intervene to protect this right, especially where, as here, the prosecution was subjected to the same rules and that the procedure took place outside of the presence of the jury.

■ We now turn to whether the defense in fact proffered sufficiently race neutral justifications to warrant exclusion of the challenged jurors. "Unless a discriminatory intent is inherent in the [challenged party's] explanation, the reason offered will be deemed race neutral." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). However, the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact which is accorded "great deference" on appeal. *Id.* at 364, 111 S.Ct. at 1868–69. As the court observed in *Hernandez:*

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of [counsel's] state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

500 U.S. at 365, 111 S.Ct. at 1869 (citation omitted). *Batson* itself indicates that a "neutral explanation" is "a 'clear and reasonably specific' explanation of [counsel's] 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 & n. 20, 106 S.Ct. at 1724 & n. 20 (citation omitted).[6] Therefore, before we can find that the trial court erred in rejecting a peremptory challenge, it will be necessary for us to conclude that defense counsel's neutral explanation was a sufficiently clear and reasonably specific explanation of counsel's legitimate reasons for exercising the challenge that it overcomes the great deference due the trial court's fact finding.

In the case before us, the parties submitted their peremptory challenges of prospective jurors and alternate jurors to the court at several points during *voir dire.* Based on our reading of the record, it appears that the state submitted two such challenges and the defense seven. Outside the presence of the prospective jurors, the court asked for each side's "neutral reasons for striking." The trial court accepted the reasons offered by the state for both challenges and those individuals were excused. The trial court accepted the reasons offered by the defense for two of its challenges and those individuals were excused as well. The trial court rejected the reasons offered by the defense for five of its challenges and those jurors were seated. On appeal, defendant contends that the trial court improperly rejected four of those challenges.

The record shows the following occurred [7] when defense counsel was asked by the trial court for a race-neutral reason for challenging these four prospective jurors:

1. The defense indicated that it sought to strike prospective juror Sosnawski, a white male, because in defense counsel's "discussions with him, [counsel] didn't get the impression that he really understood what was going on." Finding "impres-

sions" to be a "terrible reason" and a "euphemism" (presumably for a racially motivated strike), the trial court found the explanation "not race neutral" and refused to excuse Sosnawski.

2. The defense indicated that it sought to strike prospective juror Wilson, a white male, because defense counsel's "general impression" was, "number one, that he was not being honest; two, that his responses ... left [counsel] with the impression that this gentleman was maybe not being entirely honest with you." Because counsel was not "able to point to a question and answer in the record that gives [ ] a good reason for striking [Wilson] from the jury," the trial court refused to excuse Wilson.

3. The defense indicated that it sought to strike prospective juror Bobalik, a white female, because she failed to understand the presumption of innocence. During *voir dire,* defense counsel had asked all the members of the panel who believed that the defendant was not guilty at that point to raise their hands. Bobalik was apparently the only juror who did not raise his or her hand. The trial court rejected this reason, commenting that counsel had asked "a trick question," the kind "that get students flunked out of law school." Because counsel did "not have a record showing that Bobalik [could] not give the defendant the presumption of innocence," the trial court refused to excuse Bobalik.

4. The defense indicated that it sought to strike prospective juror Brandys, a white female, because she didn't "understand[ ] that the defendant has the absolute right not to testify" and that "[s]he clearly indicated ... in two points, one, that she wanted the defendant to testify; two, that she thinks defense attorneys are slicksters." The state argued that Brandys did properly understand the presump-

---

**6.** While the United States Supreme Court appears to have backed away from this test in *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam), it did not do so until well after this case was tried.

**7.** Defendant's brief sets forth additional justifications for the peremptory challenges of these four

prospective jurors, at least some of which appear to us to have been race-neutral. However, only the justifications set forth in the following paragraphs were actually advanced at trial. Given the standard of review enunciated in *Hernandez,* we will not search the record to find a justification not asserted by defendant at trial.

tion of innocence. Concluding that most people want the defendant to testify and don't understand that they have a constitutional right not to unless it is explained to them and that defense counsel had introduced the word "slickster," not Brandys, the trial court refused to excuse Brandys.

■ With respect to (1) Sosnawski and (2) Wilson, we are unable to conclude that defense counsel gave a sufficiently clear and reasonably specific explanation of defense counsel's legitimate reasons for exercising the challenge to overcome the "great deference" due the trial court's findings. Counsel's reliance on "impressions" without being able to point to any answer or act of the prospective juror simply does not meet the standard of a "clear and reasonably specific explanation."

■ With respect to Bobalik, though we do not necessarily share the trial court's view that counsel had asked a "trick question," we do agree that the failure to raise one's hand in response to such a question without more is not sufficient to cast doubt on a juror's ability to understand the presumption of innocence. As failure to understand the presumption of innocence was the only reason counsel gave for challenging Bobalik and Bobalik's failure to raise her hand was the only explanation for that reason, we are unable to conclude that defense counsel gave a sufficiently clear and reasonably specific explanation of defense counsel's legitimate reasons for exercising the challenge to overcome the

"great deference" due the trial court's findings.

Finally, with respect to Brandys, we do not necessarily agree with the trial court that a juror cannot be expected without explanation from counsel to understand that a defendant has a constitutional right not to testify. However, we have reviewed the record of the prosecutor's and defense counsel's questioning of Brandys and fail to find any answers that support the two reasons given for the peremptory challenge.[8] Brandys did not refer to defense lawyers as "slicksters," defense counsel did; Brandys only said that she thought both defense counsel and the prosecutor had "game plans." And Brandys agreed without reservation to defense counsel's question as to whether the defendant had "an absolute right not to testify." We are unable to conclude that defense counsel gave a sufficiently clear and reasonably specific explanation of defense counsel's legitimate reasons for exercising the challenge to overcome the "great deference" due the trial court's findings.

### d. *Rule for Future Cases.*

Having found no reversible error, we nevertheless find the reasoning of Judge Barteau in *Pfister* and of Judge Manion in *Doe v. Burnham* quite persuasive. In exercise of our supervisory responsibilities, we adopt the following procedures for cases tried after the date this opinion is certified.

---

**8.** Here is the relevant colloquy between defense counsel and prospective juror Brandys:

Defense: Do you have the desire to see or hear Mr. Williams take the witness stand?
Brandys: I think so.
Defense: Why?
Brandys: I guess if I were in his shoes, I'd want to tell my side of the story.
Defense: Beginning from that point, would you believe or think if he didn't take the stand he must be guilty?
Brandys: No.
Defense: Why not?
Brandys: I guess I'd figure you had a game plan and that was part of it. I don't know.
Defense: Do you look at the defense attorney as kind of like slicksters with a game plan?
Brandys: Not in those words, but no, there is a game plan, everyone has one.

Defense: You think [the prosecutor] has a game plan as well?
Brandys: Sure he does.
Defense: When—and I'm not really trying to joke around, I'm really trying to understand. When you say that you would prefer if he took the stand, of course that's related to your conception or the conception or perception you will have of his guilt?
Brandys: No. All I'm saying is if I were in his shoes, I would want to take the stand.
Defense: Can you separate that personal thought from the law in the State of Indiana which is that a defendant has an absolute right not to testify?
Brandys: Sure, sure.
Defense: Not only does he have that absolute right not to testify, he has the right for you not to look at that adversely in your deliberations?
Brandys: No, I understand that.
Defense: Okay. Thank you, ma'am.

We conclude that the interests the state and a criminal defendant have at stake in a trial are weightier than the interests of a juror in serving in a particular case. Accordingly, we conclude that absent extraordinary circumstances a trial court should not require each side to present a race-neutral justification for each of its peremptory challenges. Trial courts should wait for an objection by an opposing party before deciding whether a *prima facie* case of discrimination is made and demanding a race-neutral explanation. Intervention *sua sponte* is only authorized when a *prima facie* case is abundantly clear with respect to a particular juror. Obviously, a judge who adopts a blanket policy of demanding explanations, as the court did here, would not have articulated a particularized showing and would commit error.

## 2. *Trial Court Limitations On Employment of Defense Experts.*

Defendant contends that the trial court committed reversible error when it restricted the performance of a court-appointed mitigation expert and did not appoint a psychologist until a few days prior to trial.

The following sequence of events gave rise to this contention. The state filed its notice that it would seek the death sentence on September 25, 1992. On October 8, defendant submitted a proposed order to the court providing for the employment of Curtis Robinson "as a mitigation specialist ... for up to ten (10) hours." The court signed the order, which also provided that the defendant would be required to petition the court for conferences in excess of ten hours. On November 30, defense counsel asked the court to provide "adequate funds" for Curtis Robinson to conduct "a social investigation concerning defendant's background" to assist counsel in its preparation for the penalty phase of the trial. The court entered an order on December 8 approving the request for a maximum ten (10) hours at thirty dollars ($30.00) an hour. On January 12, 1993, defendant asked for a continuance of the trial date. In its brief supporting the request, defense counsel did not mention the time limitation placed on the mitigation expert's work but did indicate that he had had "insufficient time" to investigate "defendant's background so as to make a reasoned decision regarding what evidence in mitigation to present." On January 14, defendant filed affidavits of three lawyers and two mitigation specialists with substantial experience in death penalty cases. While the principal purpose of these affidavits appears to be to support the request for continuance, the affidavits of two of the lawyers and the two mitigation specialists contend that the time limitations placed upon Curtis Robinson's mitigation investigation were too restrictive. On January 20, defendant asked the court for additional funds for Curtis Robinson to continue the "social investigation concerning the defendant's background." [9] Also on that date, defendant filed affidavits of an additional lawyer and an additional mitigation specialist with substantial experience in death penalty cases. The mitigation specialist's affidavit supported the contention that the time limitations placed upon Curtis Robinson's mitigation investigation were too restrictive. The court entered an order that day specifying that "[a]n additional fifteen hours has been granted."

On January 21, defendant submitted a proposed order appointing Dr. Douglas Caruana "to conduct a full and complete psychological evaluation of defendant and to testify at the penalty phase in the trial, should he be convicted of a capital offense." The trial court signed the order on the day submitted. On January 25, the date set for trial, defendant renewed his motion for a continuance, contending that the defense had not been able to complete the compiling of mitigation evidence. In this motion, defendant argued that the 25 hours allowed for Curtis Robinson's investigation were "woefully inadequate in terms of the amount of time required for and number of tasks which he must perform." Filed with this motion was a letter dated January 19 from Robinson to defense

---

**9.** Mr. Robinson believed he needed additional time to (i) develop a complete life history of defendant, including psycho-social and physical development; (ii) collect records and documents pertaining to the defendant's background and development; (iii) present this complete life history to a licensed psychologist who can assist defense counsel in developing a cohesive theory of mitigation; and (iv) assist defense counsel in presenting as complete a picture as possible.

counsel describing the investigation conducted to date which Robinson indicated had "consumed well over the twenty-five (25) hours allotted" by the trial court and listing "key areas" of defendant's history that Robinson was "unable to explore due to limitation of time and billable hours." This listing covers three single-spaced pages. The Robinson letter says that Robinson "initially indicated it would take a minimum of three hundred (300) hours to adequately service this case."

As noted, this motion and letter were filed on the morning set for trial. The trial court denied the motion. When defense counsel indicated that Mr. Robinson had exhausted the additional fifteen hours of investigative time soon after they were granted, the court responded, "Twenty-five hours is more than adequate."

 While Indiana has long provided expert assistance at the state's expense to indigent defendants,[10] we have nevertheless held that, even in a capital case, a criminal defendant is not constitutionally entitled, at public expense, to any type or number of expert witnesses he desires to support his case. *Harrison v. State*, 644 N.E.2d 1243, 1252 (Ind.1995) (quoting *James v. State*, 613 N.E.2d 15, 21 (Ind.1993), and citing *Kennedy v. State*, 578 N.E.2d 633, 640 (Ind.1991), *cert. denied*, 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992)). A defendant who requests funds for an expert witness has the burden of demonstrating the need for that expert. *Id.* The appointment of experts is left to the sound discretion of the trial court. *Id.*

We have had several occasions to review claims that the trial court abused its discretion in denying defense requests for the appointment of experts in death penalty cases.[11] In *Harrison v. State*, we concluded that the trial court did not abuse its discretion in

denying defendant's request for an expert to interpret DNA test results where the experts testifying at trial were neutral and the nature of the testimony involved precise physical measurements and chemical testing. 644 N.E.2d at 1253. However, in *James v. State*, we found the trial court abused its discretion in denying defendant's request for a blood spatter expert where the testimony from the state's blood spatter expert, which provided evidence of an intentional killing, was central in the penalty phase and knowledge concerning cross-examination of blood spatter experts is not the kind of experience that defense counsel would normally be expected to possess. 613 N.E.2d at 21. In *Castor v. State*, we also found that the trial court abused its discretion in refusing to appoint a psychologist to assist in establishing the existence of a statutory mitigating circumstance, *to wit*, that the defendant may have been under the influence of extreme mental or emotional disturbance when he committed the acts alleged in the information. *Castor v. State*, 587 N.E.2d 1281, 1288 (Ind.1992). In *Hough v. State*, we found that the trial court did not abuse its discretion in denying defendant's requests for appointment of a psychologist or a psychiatrist and of an independent ballistics expert because the defendant had given no indication of what he expected to establish by use of these experts, *i.e.*, he sought an exploratory investigation with no showing of its probable results. *Hough v. State*, 560 N.E.2d 511, 516 (Ind.1990).

In respect of capital cases, we have codified these principles in Indiana Criminal Rule 24(C)(2), which provides:

Counsel appointed in a capital case shall be provided with adequate funds for investigative, expert, and other services necessary to prepare and present an adequate defense at every stage of the proceeding, including the sentencing phase. In addi-

---

**10.** *See Scott v. State*, 593 N.E.2d 198, 199 (Ind. 1992) (comparing *Webb v. Baird*, 6 Ind. 13 (1854), with *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)).

**11.** These claims often cite as authority the United States Supreme Court decision in *Ake v. Okla-*

*homa*, where the court, observing that principles of fundamental fairness entitle an indigent defendant to an adequate opportunity to present the defendant's claims fairly within the adversary system, held that due process requires the appointment of psychiatric experts, at least when sanity is an issue. 470 U.S. 68, 85–86, 105 S.Ct. 1087, 1097–98, 84 L.Ed.2d 53 (1985).

tion to the hourly rate provided in this rule, all counsel shall be reimbursed for reasonable incidental expenses as approved by the court of appointment.

In this case, we are not faced with a challenge to a trial court's denial of a defendant's request to hire experts. Rather, defendant claims that the trial court abused its discretion by (i) appointing a psychologist as a defense expert only on the eve of trial and (ii) limiting to 25 hours the time for the mitigation expert.

As to the claim with respect to the psychologist, we find no error. The psychologist was appointed by the court the very day such appointment was requested by the defense.

As to the claim that the trial court abused its discretion by limiting the mitigation expert to 25 hours of investigation, we agree with the defendant that under Crim.R. 24(C), the trial court had no authority to limit the expert's time so severely. While a trial court is authorized to maintain reasonable oversight on the volume and amount of Crim.R. 24 expenses (and we by no means approve the multi-page list of matters that defendant's mitigation expert here advanced as necessary in any death penalty mitigation investigation), the prior restraint imposed on the mitigation specialist's work here well exceeded reasonable bounds. While we do not subscribe to defendant's witnesses' claims that 100 to 500 hours of mitigation research is required in most death penalty cases, we are satisfied that 25 hours is too few. We find the trial court's limitation here to have been arbitrary and an abuse of discretion.[12]

However, we do not find the trial court's error in this regard to require reversal. The purpose of the mitigation investigation is to identify and develop those aspects of defendant's background, character or record and those circumstances of the offense that may be proffered as a reasonable basis for imposing a sentence other than death.[13] It follows, then, that if the defendant is able to present effectively to the jury during the penalty phase and to the court at sentencing all such aspects and circumstances, no reversible error can be said to occur. We conclude that this was the case here and that defendant suffered no prejudice from the limitation placed on the mitigation expert.

First and foremost, the defendant did present a substantial mitigation case. The jury heard from Dr. Caruana, the defense psychologist, who indicated that he had spent a total of 9½–10 hours in clinical interviews with the defendant ("a little longer than normal" in such circumstances), and also reviewed the results of I.Q., academic, and personality tests administered at his instruction. Dr. Caruana testified as to the defendant's "low normal" I.Q. and his poor academic skills. He testified as to the defendant's family background and the "very chaotic" and "abusive" surroundings in which defendant was raised. And he testified as to the damage that these factors did to the defendant's personality.

The jury also heard testimony from defendant's mother and aunt, both of whom gave further details on defendant's upbringing. Central to their testimony was the behavior of defendant's father who was present in the home until imprisoned when defendant was 17. The testimony was that the father fired

**12.** In situations where a trial court has imposed unreasonable limitations on a defendant's rights under Crim.R. 24, interests of judicial economy may dictate that trial counsel not wait until appeal to seek recourse. Often the Indiana Public Defender Commission, which administers our reimbursement program, can be of assistance. And while we strongly encourage defense counsel to resolve such disputes at the trial court level, our court is open to receive motions seeking to rectify trial court violations of Crim.R. 24.

**13.** *Cf. Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 2951–52, 106 L.Ed.2d 256 (1989) (jury must be able to consider and give effect to

any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime); *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (plurality opinion of Burger, C.J.)) (sentencer may not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death); *Smith v. State*, 547 N.E.2d 817, 821 (Ind.1989) (quoting *Penry* and citing *Eddings* ).

guns in the home, beat the defendant, had sex with his daughters, *i.e.*, defendant's sisters, fathered a child by one of his daughters, and violently injured this child (resulting in the removal of the father from the home and his ultimate criminal conviction). Both Dr. Caruana and defendant's mother and sister presented additional testimony at the sentencing hearing. It was also clear, at least at sentencing, that the court had access to defendant's academic records.

In addition to the fact that defendant did present at the penalty phase and at sentencing substantial mitigating evidence, defendant on appeal does not identify any particular aspects of defendant's background, character or record or any particular circumstances of the offense which he would have pursued had his mitigation consultant been given additional time.[14] While we recognize that part of defendant's argument is that it was the job of the mitigation specialist to identify such issues for further exploration, it appears to us from a careful study of the record that defense counsel had identified at least the principal contours of defendant's background, character and record, including his upbringing, education, health, and psychological make-up, and effectively presented that information to the jury and the court. As such, we conclude that the defendant presented effectively to the jury

during the penalty phase and to the court at sentencing all those aspects of defendant's background, character or record and those circumstances of the offense that could have been proffered as a reasonable basis for imposing a sentence other than death.[15] Defendant suffered no prejudice from the limitation placed on the mitigation specialist. *Cf. Hough,* 560 N.E.2d at 517 (defendant not entitled to appointment of an expert where he "offered no grounds from which to reason or suppose that any other expert would find cause to question the State's witnesses, observations, or conclusions" but sought only an "exploratory investigation with no showing of its probable results.")

Finally, the purpose for which the additional hours were sought were for further "social investigation concerning defendant's background." When we review the aggravating and mitigating circumstances in this case; we think that additional social history, in light of the aggravating circumstances of multiple intentional killings while attempting to commit robbery, would have had a sufficiently minor impact so as not to have affected the outcome of the jury's recommendation or the judge's sentencing decision. While we do not know why the jury failed to reach a recommendation, we do know that the trial court considered and weighed the mitigating circumstances presented.[16] With respect to

**14.** In his brief, defendant contends that had his experts not been restricted by the trial court, the mitigation evidence he did present "would necessarily [have been] greater in depth" but does not contend that there were *additional* aspects or circumstances that were unable to be explored.

We also note that four weeks passed between the conclusion of the penalty phase and the initial sentencing hearing. As the jury had been unable to reach a recommendation for or against death, the trial court would be making the sentencing decision without the benefit of a jury recommendation. Ind.Code § 35–50–2–9(f) & (g) (1991 Supp.). We believe that if there were additional mitigating circumstances to investigate, defense counsel would have renewed its request for additional hours during this time.

**15.** In his brief, defendant calls our attention to the following comment by the trial court at the sentencing hearing:

Is there any other source of psychological information available to the court other than what I've been provided as part of the presentence report? ... Well, I just have the

feeling that I just don't know this man then. I don't know him.... I just don't know him. I see an awful lot of outward manifestation of what I think he is, but I don't see anything of the inner man here in this page and a half outline ...

We agree that these comments by the court are somewhat ironic in view of the limitations the court placed on the use of the mitigation specialist. But it appears to us that these comments were directed primarily at the pre-sentence investigation report and that the court's concerns were satisfied when Dr. Caruana appeared at the sentencing hearing and gave additional testimony. We also note that no limitations were placed on Dr. Caruana's time and that while Dr. Caruana was only appointed on the eve of trial, five weeks had passed between the date of his appointment and the sentencing hearing.

**16.** Here is the trial court's analysis of the mitigating circumstances in this case:

The defendant's mother and sister describe and court records show a massively dysfunctional

the aggravating circumstances, the court found that defendant intentionally killed each of Michael Richardson, Debra Rice and Robert Hollins while committing robbery and that each of these aggravating circumstances outweighed the mitigating circumstances. The trial court having considered in a fair degree of detail the defendant's "social history" and having assigned it less mitigating weight than any one of the aggravating circumstances considered, we conclude that the probable impact of additional social history evidence would have been sufficiently minor so as not to have affected the outcome of the jury's recommendation or the judge's sentencing decision.

### 3. *Trial Court's Denial of Continuances.*

Defendant next contends that it was reversible error for the trial court to deny defendant's numerous motions for continuance.

On September 15, 1992, prior to the filing of the death penalty request, the trial court set defendant's case for trial by jury on February 1, 1993. On September 25, the death penalty request was filed. On October 13, the trial court reset the defendant's jury trial from February 1, 1993, to January 25, 1993. Defendant did not object to this brief acceleration of the trial schedule. Then, on January 12, 1993, defendant filed the first of two requests for a continuance, arguing that counsel could not be adequately prepared for either the guilt phases or the penalty phases

of the trial by January 25. And as noted in the foregoing section of this opinion, on January 25, the date set for trial, defendant renewed his motion for a continuance, contending that the defense had not been able to complete the compiling of mitigation evidence.

■ The granting or denial of a continuance is primarily a matter for the trial court, and the denial of one will be reviewed only for an abuse of discretion.[17] *Woods v. State,* 547 N.E.2d 772, 788 (Ind.1989), reh'g granted on other grounds, 557 N.E.2d 1325 (1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991). The record must reveal that the defendant was prejudiced by the failure to grant the continuance in order to demonstrate an abuse of discretion. *Evans v. State,* 489 N.E.2d 942, 948 (Ind.1986).

Here, the reason the continuance was requested on January 12 was because defense counsel did not anticipate being ready for either the guilt or penalty phases of the trial. However, when the motion for continuance was renewed on the morning of trial, the only reason advanced was that defendant had had insufficient time for mitigation research. We infer from the fact that the grounds asserted in the January 12 motion, *i.e.,* general unpreparedness for the guilt and penalty phases, were not renewed in the January 25 motion meant that counsel was prepared at least for the guilt phase of the trial. And because it was not reversible error for the trial court to deny the mitigation specialist additional

---

family of parents, four sisters and three brothers. His father was sentenced by this Court to three consecutive five year sentences. One sentence was for molesting his own daughter, fathering a child by her and then severely battering that child. Defendant's father routinely shot at members of his own family while drunk. There is a temptation to attribute a triple homicide to a diseased mind, a severely disabled mind, a mind temporarily gone berserk. But the evidence is to the contrary. By psychological testing, the defendant is shown to be mildly mentally disadvantaged, partially as a result of inherited characteristics and partially due to the lack of a supportive family system. He is assessed however as having low normal I.Q. skills with basic concrete coping abilities. There was no evidence of mental disease or disability nor cognitive dysfunction. He was and is sane and not acting under an irresistible impulse. His marginal mental capacity is a mitigator in the low range.

. . .

[Defendant] is a twenty-four year old, single, African–American male, high school dropout, unemployed, occasionally attending Apostolic, in good health. The defendant asserts he left home at age eighteen because of an emotionally and [sic] abusive father. The Court notes parenthetically that the father was committed to prison to serve fifteen years when the defendant was seventeen years old. There can be no question that prior to his leaving home, life as he knew it was chaotic, poor, solitary, nasty and brutish. There was no trade to pursue and nothing constructive to otherwise occupy his time. This mitigator is on the low end of the weight scale.

**17.** Ind.Code § 35–36–7–1 (1988) sets forth certain statutory bases entitling defendant to a continuance. However, defendant here does not claim any statutory violation.

hours, it was also not reversible error for the trial court to deny the January 25 motion for continuance. *Compare Harrison v. State,* 644 N.E.2d 1243, 1253 (Ind.1995).

### 4. *Sufficiency of Evidence—Murder of Debra Rice.*

Defendant contends there was insufficient evidence as a matter of law to support the defendant's conviction of the murder of Debra Rice.

Defendant contends that Rice was first shot by defendant's accomplice, Joshua, and that a pathologist's testimony was that this wound alone would have been fatal. He argues, therefore, that because Rice had already suffered a fatal wound, the jury could not conclude beyond a reasonable doubt that defendant intentionally murdered her.[18]

 There was evidence at trial that after Joshua shot Rice, she lay on the floor making moaning noises. Thus the jury could have concluded that even though the wound inflicted by Joshua would itself have been fatal, she was still alive at the time defendant shot her and that, as the trial judge said, "though the pre-existing wound to Debra Rice was a fatal one, the defendant accelerated her death by minutes." We do not reweigh the evidence or determine the credibility of witnesses but consider only the evidence most favorable to the verdict together with all reasonable inferences drawn therefrom when considering the sufficiency of the evidence. *Taylor v. State,* 479 N.E.2d 1310 (Ind.1985). Defendant's claim that Joshua, not defendant, killed Rice was for the jury to determine. From the evidence they could have concluded that it was defendant's shot to the back of Rice's head that killed her. The evidence was sufficient to support defendant's conviction of the intentional murder of Rice.

---

18. Defendant does not dispute his conviction for the felony murder of Rice.

19. "The aggravating circumstances [for which the state may seek a death sentence for murder] are ...: (1) The defendant committed the murder by intentionally killing the victim while com-

### *Death Sentence Review*

 The Indiana Constitution provides that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." Ind. Const. Art. 7, Sec. 4. Although our rules for appellate review of sentences require that great deference be given to the judgment of the trial court, *e.g.,* Ind.Appellate Rule 17, where the sentence is death, those rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." *Spranger v. State,* 498 N.E.2d 931, 947 n. 2 (Ind.1986), *reh'g denied* 500 N.E.2d 1170 (Ind.1986), *cert. denied,* 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987). In fact, we have made it clear that "this Court's review of capital cases under Article 7 is part and parcel of the sentencing process." *Cooper v. State,* 540 N.E.2d 1216, 1218 (Ind.1989).

*Penalty Phase.* Our death penalty statute guides our review of death sentences by setting forth standards governing trial court imposition of death sentences. Following completion of the guilt phase of the trial and the rendering of the jury's verdict, the trial court reconvenes for the penalty phase. The State must prove at least one aggravating circumstance beyond a reasonable doubt. The defendant has the opportunity to present any additional evidence relevant to the aggravating circumstances alleged and to any mitigating circumstances. Ind.Code § 35–50–2–9(d) (1989 Supp.).

Prior to trial, the state charged two counts in support of its death penalty request. In the first count, the state charged pursuant to Ind.Code § 35–50–2–9(b)(1) (1989 Supp.)[19] that the defendant "did intentionally kill Michael Richardson, and/or Debra Rice, and/or Robert Hollins, while committing or attempting to commit Robbery." In the second count, the state charged pursuant to Ind. Code § 35–50–2–9(b)(8) (1989 Supp.)[20] that

---

mitting or attempting to commit ...: (G) Robbery (IC 35–42–5–1)." Ind.Code § 35–50–2–9(b)(1)(G).

20. "The aggravating circumstances [for which the state may seek a death sentence for murder] are ...: (8) The defendant has committed another murder, at any time, regardless of whether the

the defendant "murdered two or more persons by knowingly or intentionally killing Michael Richardson, Debra Rice, and Robert Hollins."

At the outset of the penalty phase, the trial court read to the jury all of the aggravating circumstances listed in the death penalty statute. Defendant claims that it was reversible error for the court to do so, citing to our opinion in *Lockhart v. State,* 609 N.E.2d 1093 (Ind.1993). In *Lockhart,* we agreed with the defendant that the trial court had erred when it read to the jury on several occasions the list of twelve aggravating circumstances contained in the statute but found the error to be harmless where the jury was specifically charged to determine whether the state carried its burden of proving beyond a reasonable doubt the existence of one of the two charged aggravators. *Lockhart,* 609 N.E.2d at 1101 (Ind.1993). *Lockhart* was decided after the trial in this case and we decline to give it retroactive application. And just as the reading of all the aggravating circumstances was found to be harmless error in that case, we find so here. The trial court explained to defense counsel that it was reading all the aggravating circumstances as preliminary instructions at the penalty phase to give the jury an overview of the death sentencing process, an "overall view of the law." However, the trial court recognized that it would be appropriate to read only those aggravating circumstances properly before the jury as final instructions. This is what the trial court did here and we find no error.

Defendant claims two additional errors with respect to these aggravating circumstances. First, defendant contends that the trial court instructed the jury that the state had charged the existence of four aggravating circumstances when in fact the state had only charged two. As noted above, the state charged the existence of certain aggravating circumstances in two counts, each of which recited the existence of an "aggravating cir-

cumstance," *i.e.,* used the singular noun "circumstance." The trial court's instruction in this regard was as follows:

In the second or sentencing stage of this trial, the State is seeking the death penalty by alleging the existence of these aggravating circumstances:

1. Edward Earl Williams intentionally killed Robert Hollins while committing or attempting to commit robbery; and/or

2. Edward Earl Williams intentionally killed Debra Rice while committing or attempting to commit robbery; and/or

3. Edward Earl Williams intentionally killed Michael Richardson while committing or attempting to commit robbery; and/or

4. Edward Earl Williams knowingly or intentionally killed two or more persons, namely: Michael Richardson, Debra Rice, and Robert Hollins.[21]

Certainly the trial court could not instruct the jury on uncharged aggravating circumstances. But the intentional killing of each of the three victims while committing or attempting to commit robbery was charged and does constitute three separate aggravating circumstances. What the trial court did here was to take an unartfully drafted charge and parse it in a way the jury could understand. We find no error.

Second, defendant claims that it was improper to use the second aggravating circumstance set forth in the second count at all. As noted above, this count alleged as an aggravating circumstance that the defendant had "knowingly or intentionally killed two or more persons, namely: Michael Richardson, Debra Rice, and Robert Hollins." Defendant argues that this aggravating circumstance alleged "that defendant had committed multiple killings" but that "there is no statutory aggravating circumstance under IC 35–50–2–9, that specifies multiple killings in one incident as a statutory aggravating circumstance justifying imposition of the death penalty."

defendant has been convicted of that other murder." Ind.Code § 35–50–2–9.

**21.** This is the preliminary instruction setting forth the charged statutory aggravating circum-

stances given at the penalty phase. The counterpart final instruction detailed the elements of each of these four circumstances.

■ The state alleged this aggravating circumstance pursuant to Ind.Code § 35–50–2–9(b)(8) which provides as an aggravating circumstance that "the defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder." The language of this provision in no way excludes multiple killings in one incident—"at any time" plainly includes "at the same time." This aggravating circumstance is available in cases involving double or multiple murders. *See Conner v. State*, 580 N.E.2d 214, 222 (Ind.1991) (DeBruler, J., concurring in result). In fact, we have held that this multiple murder aggravating circumstance is applicable *only* in cases in which the defendant is tried in the same proceeding for the multiple murders alleged in the aggravating circumstance. The aggravating circumstance of commission of another murder not reduced to conviction is unconstitutional as applied when the other murder is unrelated to the instant murder. *State v. McCormick*, 272 Ind. 272, 397 N.E.2d 276 (1979). Finally, in its sentencing order, the trial court indicated that it did not utilize this aggravating circumstance at all in arriving at its sentence.[22]

### Trial Court Sentencing Determination.

In this case the jury was unable to agree on a sentence recommendation. Our death penalty statute provides that when the jury is unable to agree on a sentence recommendation after reasonable deliberations, the court shall discharge the jury and proceed as if the hearing has been to the court alone. Ind.Code § 35–50–2–9(f) (1991 Supp.). In such a situation, the court may sentence the defendant to death only if it finds (i) that the state has proved beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists and (ii) that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

Ind.Code § 35–50–2–9(g) (1991 Supp.). The trial court must make a record of its reasons for selecting the sentence that it imposes. Ind.Code § 35–38–1–3 (1988).

■ These statutory provisions make clear that the sentencing court has a separate and independent role in assessing and weighing the aggravating and mitigating circumstances and in making the final determination whether to impose the death penalty. *Benirschke v. State*, 577 N.E.2d 576, 579 (Ind.1991), *reh'g denied*, 582 N.E.2d 355 (Ind. 1991), *cert. denied* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992).

■ The trial court's sentencing order met these requirements. In arriving at its own separate determination as to whether the death penalty is an appropriate punishment, the sentencing court is to point out its employment of this process in specific and clear findings, *id.*, and did so here. As required of it by the foregoing statutory provisions and case law, the trial court's statement (i) identified each mitigating and aggravating circumstance found, (ii) included the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) found that the state had proved beyond a reasonable doubt the existence of the four aggravating circumstances, (iv) found that the mitigating circumstances that existed were outweighed by the aggravating circumstances, and (v) set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

Based on our review of the record and the law, we agree that the state has proven four aggravating circumstances authorized by our death penalty statute beyond a reasonable doubt and that the mitigating circumstances that exist are outweighed by the aggravating circumstances. We conclude that the death penalty is the proper and appropriate sentence for defendant's murder of Michael

---

**22.** In its sentencing order, the trial court said: "Because this [multiple murder] aggravating factor involves the deaths of the same persons named in the first three aggravating factors it will not be assigned any weight when balanced against the mitigating factors. The statutory purpose of assigning aggravating factors to the death of any one person is to limit the class of death eligible defendants. That purpose is not served by 'piling on' once that class of persons has been identified. In other words, [the multiple murder] aggravator [here] is inherently contained in the three previous aggravators."

Robinson, Debra Rice and Robert Hollins. We further find this sentence to be proportionate not only to the nature of the offenses and the character of the defendant, but also to the sentences approved for capital murder defendants in other Indiana cases. *See Bivins v. State* 642 N.E.2d 928, 959 (Ind.1994) (collecting cases).

#### Conclusion

Defendant's convictions and death sentence are affirmed.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.