**Akeem AKI–KHUAM, f/k/a Edward E. Williams, Petitioner,**

v.

**Cecil DAVIS, Superintendent, Indiana State Prison, Respondent.**

**No. 3:00 cv 386 AS.**

United States District Court, N.D. Indiana, South Bend Division.

March 25, 2002.

---

Brent Westerfield, Indianapolis, IN, Eric Koselke, Indianapolis, IN, for plaintiff.

Stephen R. Creàson, Indianapolis, IN, for defendant.

### MEMORANDUM AND ORDER

ALLEN SHARP, Judge.

Petitioner, Akeem Aki–Khuam, f/k/a Edward Williams,[1] was convicted of murder in a state court trial conducted in Lake County, Indiana, and was sentenced to death by the judge conducting that trial upon the recommendation of the jury that heard the case. The within petition was filed by counsel in this Court on December 14, 2000 and oral argument was heard in Lafayette, Indiana on August 20, 2001. Additionally, supplemental briefs were filed on October 29 and November 13, 2001. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA)

1. Although this court recognizes petitioner's legal name to be Akeem Aki–Khuam, to avoid confusion with the opinions of the Indiana Supreme Court, this court will refer to petitioner by his prior name, Edward Williams.

28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely *Williams v. State,* 669 N.E.2d 1372 (Ind. 1996), *cert. denied,* 520 U.S. 1232, 117 S.Ct. 1828, 137 L.Ed.2d 1034, (1997) and *Williams v. State,* 724 N.E.2d 1070 (Ind. 2000), *cert. denied,* 531 U.S. 1128, 121 S.Ct. 886, 148 L.Ed.2d 793 (2001). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

The Indiana Supreme Court, in its opinion on direct appeal, described the crime committed by Williams as follows:

> In the early morning hours of June 19, 1992, defendant, armed with a handgun, Jemelle Joshua, armed with a shotgun, and three others set out to steal audio and video equipment from the basement of school teacher Michael Richardson. Defendant and Joshua were admitted to Richardson's home and their three accomplices followed them in. Besides Richardson, they encountered a number of children and adults, including Richardson's sister, Debra Rice, and Robert Hollins. While defendant held his gun to Richardson's head and Joshua held Rice, their accomplices headed for the basement. Hollins intercepted them and began to wrestle with one of them in the kitchen. Defendant responded by shooting Hollins in the back.

> The electronic equipment proved too difficult to remove and the defendant ordered the occupants of the house to lie down. Rice attempted to escape and Joshua shot her in the chest. As the invaders left the home, defendant shot each of Hollins, Rice and Richardson once in the head despite Richardson's

plea, "Please don't kill me." A few hours later, defendant would tell his sister that he shot the victims so there wouldn't be any witnesses.

*Williams v. State,* 669 N.E.2d 1372, 1375–76 (Ind.1996). An information and affidavit of probable cause was filed on July 18, 1992, charging Williams and his co-defendants Jemelle Joshua, Che Grafton, Mark Harris, and Jesse Taylor, with three counts of felony murder. T.R. 5.[2] At the initial hearing on July 21, 1992, David Schneider was appointed as Williams' counsel, and on August 25, 1992, Schneider filed a notice of alibi on Williams' behalf. T.R. 12, 17. On September 15, 1992, Judge James Letsinger scheduled the trial for February 1, 1993. T.R. 21. On September 25, 1992, the prosecutor filed two additional counts against Williams, seeking the death penalty. T.R. 22. On October 1, 1992, Williams was advised of the additional counts, and Darnail Lyles was appointed as second chair. T.R. 37. On October 8, 1992, Judge Letsinger granted Williams' motion for the appointment of a mitigation specialist, but limited that expert to ten (10) hours, and on October 13, 1992, Judge Letsinger accelerated the trial date to January 25, 1992. T.R. 42,43.

At the final pre-trial hearing on January 12, 1993, Judge Letsinger granted Williams' motion to direct the jury commissioner to list the persons excused from jury duty, and granted his motion for sequestration of the jury. T.R. 49. The judge denied Williams' motion for continuance, his motion challenging death qualification voir dire questions, and his motion to increase the number of peremptory challenges. *Id.* During the discussion about the number of peremptory challenges, Judge Letsinger informed the parties as follows:

---

**2.** This court will refer to the trial record as T.R. —— and the post-conviction record as P.C.R. ——.

Judge Letsinger: From the first peremptory strike, each side is going to have to have some reason for striking that person. I mean there's almost no, no person on a jury that isn't protected now. I mean they've extended it to everything.

Darnail Lyles: So what I'm hearing from the court is the peremptory challenges have now all been converted to challenges for cause?

Judge Letsinger: Almost. Almost. In the words of *Splunge*, you've got to have some plausible reason supported by the record, supported by the record, plausible reason that is nonracial, non-gender, nonreligious, non-body language. They won't even let—they won't even allow body language. *Splunge* struck a black juror because she said—she didn't understand the burden of proof in a criminal case, when actually her answers were the same as everybody else's answers. It had to be supported by the record. P.C.R. 101–102. No further discussion was had on the issue of peremptory challenges.

A week later, on January 20, 1993, Judge Letsinger granted Williams' motion for an additional fifteen hours of funds for the mitigation expert. T.R. 114. That same day, Williams' counsel amended his notice of alibi, and withdrew his initial alibi. T.R. 128, 129. The following day, Judge Letsinger granted Williams' motion for appointment of Dr. Douglas Caruana as an expert witness and ordered him to conduct a psychological evaluation of Williams. T.R. 148. On January 25, 1993, the morning of trial, Judge Letsinger again denied Williams' motion for continuance and jury selection commenced. T.R. 152.

The court allowed both sides to questions the jurors individually in front of the entire venire and then took its noon recess. T.R. 400. After the noon recess and before the venire re-entered the courtroom, Judge Letsinger asked each side to hand up its list of challenges. *Id.* He granted the prosecution's first peremptory challenge because that juror's son had been convicted of a felony, which the court found to be an appropriate race-neutral reason. T.R. 401. The judge then denied Williams' peremptory challenge of juror Sosnawski, a white male, because he found counsel's stated reason for the strike, that counsel "didn't get the impression that [the juror] really understood what was going on," to be a "euphemism and ... not race neutral." T.R. 402. The judge denied Williams' peremptory challenge of juror Wilson, a white male, because counsel's statement that his "general impression is, number one, that [the juror] was not being honest; two, that his responses, I have to always related back to my perception and whatever those responses were, left me with the impression that this gentleman was maybe not being entirely honest with you," did not, per the judge's instruction, "point to a question and an answer in the record that gives you a good reason for striking that person from the jury, that is race neutral, even though he's a white guy." T.R. 403–04. Williams challenged juror Bobalik, a white female, on the grounds that she failed to understand the presumption of innocence. T.R. 408. The court found that Williams' counsel had used a trick question[3] and that they did

---

**3.** Following a discussion with another juror on the presumption of innocence, Mr. Lyles asked the entire panel, "How many people think Mr. Williams is innocent?" T.R. 364. Mrs. Bobalik did not raise her hand. Lyles then reviewed the concept of presumption of innocence with her, but later attempted to use a peremptory challenge against her based on her failing to raise her hand with all of the other jurors.

"not have a record showing that Bobalik cannot give the defendant the presumption of innocence" and denied the challenge. T.R. 409–11.

Lyles challenged two other panel members, Mrs. Botos and Mr. Buncich. The challenge against Botos was denied, but the challenge against Buncich was allowed. T.R. 412. The panel then returned and questioning began for the four empty seats. Of this group, Williams' counsel challenged juror Brandys, a white female, because she "clearly doesn't have the understanding that the defendant has the absolute right not to testify." T.R. 479. Additionally, Lyles stated that "she also further indicated that unless the defendant testifies, she's really not looking on it as being honest, and she's indicated that she thinks the defense attorneys are slicksters.[4]" T.R. 483. The judge found that Lyles had not tried to rehabilitate her on the right to testify issue and that defense counsel had introduced the word "slickster" and denied the challenge. T.R. 480, 484. The court allowed defense counsel's strike of a Mr. Coffman. T.R. 484. The jury was seated that afternoon and sent home to pack for their sequestration. Trial began the following morning, January 26, 1993.

The prosecution presented evidence from the pathologist, testifying regarding the wounds on the victims, from the stepfather and brother of Robert Hollins, one of the victims, regarding his whereabouts on the night of the murders and regarding Williams' first visit to the Richardson home on that evening. It presented testimony from the neighbors regarding finding Michael Richardson's car keys in their yard, and testimony from Shedrick Davis, a friend of Michael Richardson's, again regarding the events of the early evening, when Williams first visited the Richardson home. After the first responding police officers testified regarding various physical evidence, the prosecution presented the testimony of Jeanette Williams, Williams' sister. T.R. 830. She testified that on the morning of June 19, 1992, Edward Williams had arrived at her home in the early morning and told her that he had gone to commit a robbery and a woman had been shot by one of his "boys," so he then shot three people in the head. T.R.

4. Here is the relevant colloquy between defense counsel and prospective juror Brandys:

Defense: Do you have the desire to see or hear Mr. Williams take the witness stand?
Brandys: I think so.
Defense: Why?
Brandys: I guess if I were in his shoes, I'd want to tell my side of the story.
Defense: Beginning from that point, would you believe or think if he didn't take the stand he must be guilty?
Brandys: No.
Defense: Why not?
Brandys: I guess I'd figure you had a game plan and that was part of it. I don't know.
Defense: Do you look at the defense attorney as kind of like slicksters with a game plan?
Brandys: Not in those words, but no, there is a game plan, everyone has one.
Defense: You think [the prosecutor] has a game plan as well?
Brandys: Sure he does.
Defense: When—and I'm not really trying to joke around, I'm really trying to understand. When you say that you would prefer if he took the stand, of course that's related to your conception or the conception or perception you will have of his guilt?
Brandys: No. All I'm saying is if I were in his shoes, I would want to take the stand.
Defense: Can you separate that personal thought from the law in the State of Indiana which is that a defendant has an absolute right not to testify?
Brandys: Sure, sure.
Defense: Not only does he have that absolute right not to testify, he has the right for you not to look at that adversely in your deliberations?
Brandys: No, I understand that.
Defense: Okay. Thank you, ma'am.

831, 834–35. She also testified that later that morning, he showed her a black .25 automatic pistol, a gold ring, and a watch which he had taken in the robbery. T.R. 839. On cross-examination, Jeanette admitted that she had been in the hospital recently not only for depression but also for drug addiction. T.R. 852.

The state next presented Lanita Charleston, who testified that she had taken Williams, Jemelle Joshua, and two other young men to Michael Richardson's home early on the evening of June 18, 1992. T.R. 891. Charleston left for a while and returned around 10 p.m., and found Williams and Joshua were still there. Around 11:30 p.m., she drove Williams and Joshua to the corner of 15th and Fillmore in Gary, where Williams got out, then returned a few minutes later carrying a gun. T.R. 901–02. She then dropped the pair off at 22nd and Massachusetts around midnight and returned to the Richardson home. T.R. 904. She stayed at the Richardson home until 12:45 a.m., at which time she received a call from Williams, asking her to come back to 22nd and Massachusetts to pick him up. T.R. 908–09. Charleston returned to 22nd and Massachusetts, and Williams asked her to drive him and his friends to 8th and Harrison. T.R. 912. At 8th and Harrison, Williams asked Charleston to continue to 8th and Grant, which she testified was two blocks from the Richardson home. T.R. 914–15. Williams and his four friends, including Joshua, then exited the car and Charleston drove home. T.R. 915. Williams called her at home at 3:00 a.m., asking her to come to the corner of 22nd Avenue and Broadway to pick him up and take him home. T.R. 916. Finally, Charleston testified that she drove Williams and Joshua to a pawn shop the next day. T.R. 920.

After a few more police witnesses, the prosecution called Mark Harris to the stand. T.R. 1155. Harris testified that on the night of June 18, 1992, he and his close friend Che "Binky" Grafton were on their way home when they ran into Williams, Joshua, and Jesse Taylor. T.R. 1157. When they met, Williams told Harris and Grafton that he "had a hit." T.R. 1158. He then asked Harris if he had a "missile," which Harris interpreted as a gun, and Harris answered affirmatively. T.R. 1158–59. Harris retrieved his gun, a twelve gauge sawed-off shotgun, from his home and loaded it. T.R. 1160. The group then went to Jemelle's house, where a grey car driven by a woman picked them up. T.R. 1165. The woman dropped the group off and Williams led them to the house. T.R. 1169. Williams directed Harris, Grafton and Taylor to hide in the bushes, then he and Joshua went to the front door. T.R. 1170. Williams and Joshua, now both armed, gained admission into the home and the other three then followed them in. T.R. 1172. Harris, Grafton and Taylor proceeded toward the basement, where they were met by Robert Hollins. T.R. 1176. Harris and Hollins wrestled, and then Williams shot Hollins in the back. T.R. 1177. Harris, Grafton and Taylor then went to the basement and attempted to steal the T.V.'s and V.C.R.'s, but were unsuccessful. T.R. 1178. When they went upstairs, Joshua directed Harris to tie the woman up with telephone cord. T.R. 1180. When she started to run away, Joshua shot her in the back with the shotgun. T.R. 1181. Joshua then handed the shotgun to Harris, and he and Williams went into a backroom. T.R. 1184. Harris saw Grafton take a set of keys and exit the back door, then re-enter and state that the keys didn't fit the car. T.R. 1186. Grafton and Taylor then left. *Id.* Williams and Joshua came back to the main room and they and Harris began to leave. T.R. 1188. As they left, Harris saw Williams shoot the three victims. T.R. 1189.

After two more police witnesses, the state rested. The defense did not present any evidence, and the case was given to the jury on January 29, 1993. T.R. 178. That afternoon, the jury reached a verdict of guilty on Counts I through VI and the penalty phase began the next morning. *Id.* In the penalty phase, Dr. Douglas Caruana testified that Williams suffered from chronic depression, interpersonal insecurity, and a mild cognitive distortion, with a low normal I.Q. and a third-grade reading ability T.R. 1659–60, 1663, 1665. Caruana also testified that Williams had been raised in a home with an abusive father who shot at him and who sexually abused his sisters. T.R. 1668–69. Williams' mother, Essie Williams, also testified regarding Williams' abusive upbringing. T.R. 1708–15. Williams' aunt, Katherine Williams also testified on Williams' behalf during the penalty phase. T.R. 1755. The cause was then given to the jury, which deadlocked and was unable to make a recommendation. T.R. 1829. Judge Letsinger then set the cause for a sentencing hearing on February 26, 1993. T.R. 1833.

At the sentencing hearing, Essie Williams testified again on her son's behalf. T.R. 1848. She also related to the court that Runny Gill, the boyfriend of her daughter Jeanette, had recently told her that he was getting a $250 reward for giving information on Edward Williams. T.R. 1851–52. Elizabeth Williams, Williams' youngest sister, testified that Williams was "nice and easy to get along with" and that her sister Jeanette was addicted to crack cocaine. T.R. 1859, 1860–61. The state presented the testimony of Melvin Swope, Hollins' stepfather, and Randolph Richardson, the father of Michael Richardson and Debra Rice, both of whom testified about the impact on their families. T.R. 1870, 1880. Finally, after Judge Letsinger stated, "I just have the feeling that I just don't know this man then," Williams presented more testimony

from Dr. Caruana. T.R. 1889, 1897. The court then listened to final arguments of counsel and continued the hearing until the following week. On March 2, 1993, Judge Letsinger announced that he had weighed the aggravating factors against the modest amount of mitigating factors and was sentencing Williams to death. T.R.1963. He then appointed Lyles to serve as co-appellate counsel. T.R. 255.

Lyles and Charles Stewart represented Williams before the Indiana Supreme Court on Williams' direct appeal. *Williams v. State*, 669 N.E.2d 1372, 1375 (Ind.1996). In a unanimous opinion authored by Justice Sullivan, the Indiana Supreme Court affirmed Williams' conviction and sentence in addressing the five issues raised in his appeal. *Id.* at 1390. Williams first challenged the trial court's denial of four of his peremptory challenges, specifically his challenges to jurors Sosnawski, Wilson, Bobalik and Brandys. *Id.* at 1380. The court reviewed the legacy of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and determined that *Batson* and its progeny protect the constitutional right to equal protection under the law of both defendants and prospective jurors, *i.e.*, the right that a prospective juror will not be excluded from service on the basis of race or gender. *Id.* at 1377. However, the court recognized that peremptory challenges remain available under *Batson*. *Id.* The court then considered whether the trial court's requirement of race neutral justifications for all peremptory challenges was appropriate considering the "trial court's inherent authority to manage and control proceedings ... the cherished role of the peremptory challenge ... and ... the equal protection right of potential jurors, as well as litigants, to jury selection procedures that are free from racial or gender bias." *Id.* at 1378. The court held that the trial court's procedure was not reversible error and

then considered the defendant's proffered race neutral justifications under a standard it gleaned from *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), as follows:

"Unless a discriminatory intent is inherent in the [challenged party's] explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). However, the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact which is accorded "great deference" on appeal. *Id.* at 364, 111 S.Ct. 1859.

669 N.E.2d at 1379. Continuing on, the court determined that it must find "defense counsel's neutral explanation was a sufficiently clear and reasonably specific explanation of counsel's legitimate reasons for exercising the challenge that it overcomes the great deference due the trial court's fact finding." *Id.* at 1380. The court determined that the race-neutral reasons proffered by defense counsel on the four jurors were not "clear and reasonably specific" explanations, and thus they affirmed the trial court's procedure in this case. *Id.* at 1381. However, the court then went on to establish a rule for future cases outlawing the procedure followed by Judge Letsinger in this case. *Id.* at 1382.

The court then addressed Williams' claim that the trial court had committed reversible error when it restricted his use of a mitigation expert. *Id.* at 1384. The court agreed that the limitation of 25 hours of investigation by the mitigation expert was arbitrary and an abuse of discretion, but did not find that to be reversible error because the court felt that Williams' background had been adequately presented to the jury by the testimony of Dr. Caruana. *Id.* The court similarly held that the trial court's denial of defendant's numerous motions for continuance was not reversible error, since the first motion on January 12

was too general and the second motion on January 25 asked for more time for the mitigation expert, which the court found was adequately covered by the testimony of Dr. Caruana. *Id.* at 1386.

Williams also challenged the sufficiency of the evidence supporting his conviction for the murder of Debra Rice, contending that since Joshua had shot her first and there was evidence that his shot alone would have killed her, the jury could not conclude that Williams had intentionally murdered her. *Id.* at 1387. However, the court, quoting the trial judge, found that "though the pre-existing wound to Debra Rice was a fatal one, the defendant accelerated her death by minutes." *Id.* Thus, the Indiana Supreme Court found the evidence sufficient to support Williams' conviction for the intentional murder of Rice. *Id.*

Finally, the court reviewed the appropriateness of the death sentence. *Id.* The court first found no error in the trial court's reading of the entire list of aggravating circumstances in the preliminary instructions during the penalty phase. *Id.* at 1388. The court found no error in the trial court's instruction on the specific aggravating circumstances, nor in the trial court's consideration of the aggravating circumstance that Williams "knowingly or intentionally killed two or more persons." *Id.* at 1388–89. The court found that the trial court had appropriately weighed the aggravating and mitigating factors and made clear findings of its determination. *Id.* at 1389. Thus, the court affirmed Williams' conviction and sentence. *Id.* at 1390. Williams filed a petition for writ of certiorari to the United States Supreme Court, but that petition was denied. *Williams v. Indiana*, 520 U.S. 1232, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997).

On January 22, 1997, Ann Pfarr and Chris Hitz–Bradley of the Indiana Public

Defender's Office filed their appearance on behalf of Williams in the Lake Superior Court and filed his notice of intent to file a petition for post-conviction relief. P.C.R. 137. On June 16, 1997, Williams filed his Petition for Post–Conviction Relief in the Lake Superior Court before Judge Letsinger. T.R. 180. In that petition, he asserted the following grounds for relief: ineffective assistance of trial counsel, fundamental errors, ineffective assistance of appellate counsel, prosecutorial misconduct, judicial misconduct, unconstitutionality of the death penalty statute, and lack of full review by the Indiana Supreme Court. P.C.R. 183–87. On June 26, 1997, Williams filed a motion for change of venue from the judge, asserting that Judge Letsinger might be called as a witness due to his use of a psychological questionnaire during the sentencing process, and that motion was granted. P.C.R. 242–43. The case was then randomly reassigned to Judge Maroc, who ordered Magistrate T. Edward Page to conduct the hearing in the case. P.C.R. 417. Williams amended his petition for post-conviction relief on October 15, 1997, adding claims of incompetency, juror misconduct and juror bias. P.C.R. 582.

On December 15, 1997, Magistrate Page commenced the six-day hearing on Williams' petition for post-conviction relief. P.C.R. 1264. Williams presented testimony from Dr. Ann Tyler regarding Williams' history of abuse and the impact of that abuse on his emotional and intellectual development. P.C.R. 1274–1447. Williams called attorney David Schneider, one of his trial counsel, who testified regarding the limitations placed on trial counsel and their mitigation expert by the trial court. P.C.R. 1449–1549. Attorney Charles Stewart testified concerning his role as appellate counsel. P.C.R. 2109–69. Prosecutor John Burke was questioned regarding several instances of what Williams alleged to be prosecutorial misconduct.

P.C.R. 2282–2307. Judge Letsinger was called to testify about his use of the psychological questionnaire. P.C.R. 2575–2600. Attorney Darnail Lyles testified concerning his role as trial counsel and co-appellate counsel. P.C.R. 2634–2706.

Che Grafton, one of Williams' co-defendants, testified that he and the other defendants had placed more blame on Williams because he was an outsider. P.C.R. 2613–32, 2707–2912. Similarly, Jemelle Joshua, another co-defendant, testified that Williams had consumed alcohol and smoked marijuana on the day of the crime and that Williams had not been the instigator of the robbery plan. P.C.R. 2922–3017. Detective Thomas Branson testified regarding the arrests of the co-defendants and regarding the Crime Stoppers rewards that he had encouraged. P.C.R. 3017–3066. Dr. Douglas Caruana testified about the limited evaluation he was able to perform on Williams during the trial process and about the additional information he had gleaned on Williams during post-conviction proceedings that he would have added to his trial testimony had he had time to complete his evaluation. P.C.R. 3326–3413. Williams presented almost one hundred exhibits to the post-conviction court, then rested. P.C.R. 3489.

During its case, the state presented testimony from Dr. Michael Dimitroff, who testified that he had reviewed the same materials as Drs. Caruana and Tyler and had determined that Williams had borderline intellectual ability, but still had the capacity to plan and commit the robbery and murder. P.C.R. 3492–3540.

The post-conviction court entered its findings of fact and conclusions of law on April 27, 1998, denying Williams' petition for relief. P.C.R. 1217. The court found that Williams had not been denied effective assistance of appellate counsel due to a conflict of interest because he had not

shown how the defense theories presented by Williams and Joshua were in conflict. P.C.R. 1221. The court denied Williams' claim that he was denied effective assistance of counsel on appeal because his appellate counsel had failed to raise various issues, holding that counsel had made an informed decision as to which issues to pursue on appeal, and thus had not provided ineffective assistance. P.C.R. 1222. Williams' claim that he had received ineffective assistance of trial counsel was deemed waived because it was not raised on direct appeal. *Id.*

The post-conviction court found that Williams' claim that the Indiana death penalty statute was unconstitutional on its face and as applied was waived for failure to raise it on direct appeal. *Id.* Similarly, the court denied Williams' claim that the imposition of the death sentence by lethal injection constitutes cruel and unusual punishment, holding that lethal injection does not involve the wanton and unnecessary infliction of pain. *Id.* The court held that it had no jurisdiction to consider Williams' claim that the Indiana Supreme Court had failed to give his conviction and sentence a full and fair review on direct appeal. *Id.* at 1223. Williams' claim that he was denied the opportunity to present his defense due to the trial court's denial of his motions for continuance was denied as *res judicata,* since the Indiana Supreme Court had found the denial harmless on direct appeal. *Id.* The court denied Williams' claim that he was incompetent at the time of trial, holding that he had waived the claim by failing to raise it on direct appeal. *Id.* Similarly, the court found Williams had waived his claim that he had been denied his right to an impartial jury because a juror had failed to fully disclose his arrest record. *Id.* at 1223. The court also found waived Williams' claim that a juror was biased due to her acquaintance with one of the state's witnesses. *Id.*

The court denied Williams' claim that the state used false and misleading evidence to obtain his convictions and sentence, finding that even if the jury and judge had known of the additional facts regarding Jeanette Williams' drug use and of the victims' criminal histories and personal backgrounds, it would have made no difference in Williams' convictions or sentence. *Id.* Likewise, the court denied Williams' claim that the state suppressed exculpatory evidence, finding that none of the evidence alleged was either material or exculpatory. *Id.* at 1224. Thus, the court also denied Williams' claim of prosecutorial misconduct, finding that the claim was waived in part, and that no error had occurred. *Id.* Williams' claim that the trial judge was biased against him was denied as waived, as was his claim that his convictions and sentence were tainted by judicial misconduct. *Id.* at 1224–25. Finally, Williams' claim that his convictions and sentence were tainted with fundamental error in the jury instructions and in the psychological questionnaire were denied because no error existed. *Id.* at 1225–26. Thus, the petition was denied in full. *Id.* at 1226. Williams then appealed the denial to the Indiana Supreme Court.

On February 23, 2000, the Indiana Supreme Court denied Williams' appeal from the denial of his petition for post-conviction relief. *Williams v. State,* 724 N.E.2d 1070 (Ind.2000). Writing for a unanimous court, Chief Justice Shepard held first that Williams' trial counsel had not been ineffective. 724 N.E.2d at 1078. Williams had argued that his counsel were ineffective for failing to depose the state's witnesses, specifically Jemelle Joshua and Jimichael Parker, both of whom testified during the post-conviction proceedings that Williams had smoked marijuana on the afternoon of the crime and had been drinking alcohol that evening. *Id.* at 1077. Williams also claimed that his attorneys

failed to recognize his "verbal deficits," which might have negated the state's portrayal of him as the ringleader. *Id.* Williams further claimed that his counsel failed to interview Jeanette Williams and Earl Wilson such that they could impeach them. *Id.* The Supreme Court found that Williams did not demonstrate how these failures prejudiced him at trial. *Id.* at 1078. Williams asserted that his counsel were rendered ineffective during the penalty phase because of the restrictions placed on their mitigation expert and were ineffective in failing to do further preparation in anticipation of the sentencing hearing. *Id.* The court found that counsel's performance was not deficient during the penalty and sentencing phase. *Id.*

Williams then claimed that he had received ineffective assistance from his appellate counsel, specifically that his appellate counsel operated under a conflict of interest and that his appellate counsel failed to raise the issue of insufficient funding of the mitigation specialist on direct appeal. *Id.* With respect to the conflict of interest, the court held that Williams had not shown any prejudice from his counsel's dual representation of him and Joshua on appeal. *Id.* at 1079. On the funding issue, the court ruled that appellate counsel's performance had not been inadequate and that no showing of prejudice was made. *Id.*

Williams argued that his sentence was based on unreliable information because the judge had relied on a psychological questionnaire in determining his sentence. *Id.* The court reviewed the aggravating and mitigating circumstances without regard to the questionnaire and determined that the aggravating circumstances outweighed the mitigating circumstances, and thus no prejudice resulted from the use of the questionnaire. *Id.* at 1080.

Williams asserted that prosecutorial misconduct had tainted his conviction and sentence; specifically that the state had offered misleading evidence concerning Jeanette Williams' drug use and the victims' criminal history and character, that the state withheld exculpatory evidence of Jeanette Williams' drug use, the victims' criminal history and character, a witness' criminal history, a jail-house informant's testimony that someone other than Williams had boasted of committing the murders, reward money paid to two informants, and statements made by Williams and a witness; and that the state had delayed in charging him with the death penalty. *Id.* The court held that Williams had waived his claim regarding delay in filing the charges because he had failed to raise it on direct appeal. *Id.* With respect to the claims regarding Jeanette Williams, the court found that the state had not had Jeanette's medical records and thus had not withheld them from Williams, nor had the state committed misconduct in eliciting testimony from Jeanette Williams that she had not taken cocaine on the day Williams confessed to her and that her hospitalization for depression was due in part to her testifying against her brother. *Id.* at 1081.

Williams argued that the state "never disclosed Robert Hollins' criminal history nor the information that Michael Richardson sought sexual relations with teenage boys," but the court held those items to be inadmissible, and thus no misconduct resulted. *Id.* at 1081–82. The court found the failure to disclose Mark Harris' criminal history was not misconduct because the misdemeanors on his record were not admissible under the rules of evidence. *Id.* at 1082. Similarly, the failure to disclose the jailhouse informant's testimony was not misconduct because the statement was too ambiguous and the penalty was not based on a claim that he was the sole planner of the crime. *Id.*

Williams' claim regarding the state's failure to disclose the payment of Crime Stopper's reward money to Runny Gill, boyfriend of Jeanette Williams, and Earl Wilson, who produced one of the weapons, was denied because the failure was not sufficient to "undermine the integrity of the entire trial." *Id.* at 1083. Finally, Williams' claim that the state failed to disclose statements made by himself and Lanita Charleston was denied because the "statement" from Williams, a phone call between him and a detective, was not formal enough to require disclosure, and the statement from Charleston was not explained in the record, such that the court could not determine if its exclusion placed Williams in grave peril. *Id.* Finally, Williams appealed the involvement of Magistrate Page in conducting the hearing in his post-conviction proceedings, but the court upheld both the constitutionality of that involvement and Page's specific involvement after serving in some phases of Williams' criminal trial. *Id.* at 1086–87. Thus, the court affirmed the decision of the post-conviction court in denying relief to Williams. *Id.* at 1087. Williams filed a petition for writ of certiorari to the United States Supreme Court, but that petition was denied. *Williams v. Indiana,* 531 U.S. 1128, 121 S.Ct. 886, 148 L.Ed.2d 793 (2001).

## II. Standard of Review

A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

> A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference

by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured. *Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Williams v. Taylor* specifically addresses the application of the "contrary to, or involved an unreasonable application of, clearly established law" language from the AEDPA in the *Strickland* context. 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court

held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples*, 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke*, 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits.... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.*, citing *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary*, 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

### III. Peremptory Challenges

Williams first challenges the Indiana Supreme Court's holding in his direct appeal that the trial court's *sua sponte* requirement of a race-neutral reason for using a peremptory challenge was not a violation of his due process and equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution. When voir dire commenced, Judge Letsinger informed the parties that they would need to articulate a race-neutral reason for any peremptory challenge they wished to make, in order to comply with *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny in the United States Supreme Court. When Williams attempted to use his peremptory challenges, Judge Letsinger denied four of the strikes because he found Williams' reasons were not sufficiently race-neutral. *See supra*, pp. 1005–07. Williams appealed this decision to the Indiana Supreme Court, but that court denied the appeal, holding that Judge Letsinger's procedure was not reversible error and that, in giving the trial court's findings great deference under *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the reasons articulated by Williams were not sufficiently clear and reasonably specific to overcome the trial court's findings. 669 N.E.2d at 1379–81.

■ Respondent first asserts that Williams' peremptory challenge claim is not cognizable for federal collateral review because the right that he alleges the trial court violated, his right to fully exercise peremptory challenges, derives from state law. To obtain relief under 28 U.S.C. § 2254, Williams must establish that he is being held in violation of the United States Constitution or the laws or treaties of the United States, and the respondent argues that the peremptory challenge claim derives from Williams' right under state law to exercise peremptory challenges, not the United States Constitution. It is clear to this court, however, that Williams is complaining of a violation of the United States

Constitution. Judge Letsinger specifically referred to *Batson* and *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) in denying Williams' peremptory challenges. T.R. 402. The Indiana Supreme Court's opinion on direct appeal contained a lengthy discussion of *Batson* and its progeny as they impacted Judge Letsinger's procedure. 669 N.E.2d at 1376–79. The issue before this court is clearly one of Constitutional dimension and is thus fully cognizable for habeas review.

■ Respondent then alleges that Williams' peremptory challenge claim is barred by procedural default because Williams failed to fairly present the claim and because the Indiana Supreme Court adjudicated the claim on adequate and independent state law grounds. With respect to the fair presentment issue, the Seventh Circuit has listed four factors for this court's consideration:

> 1) whether the petitioner relied upon federal cases that engage a constitutional analysis; 2) whether the petitioner relied on state cases which apply constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

*Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir.2001). Under *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), fair presentment is satisfied as long as the operative facts and controlling legal principles are presented to the state's highest court. In his brief on direct appeal, Williams summarized his argument as follows:

> The trial court committed reversible error when it denied the defendant the exercise of the peremptory challenge of four prospective jurors based on the trial court's unsubstantiated finding that the defendant was exercising peremptory challenges on the basis of the prospective jurors' race in violation of *Batson v. Kentucky* and its progeny. There was no evidence in the record of the voir dire in this cause to suggest that the defendant was purposely and in a racially discriminatory manner attempting to exclude white prospective jurors from the jury panel because of the jurors' race. Therefore, the trial court committed reversible error when it denied the defendant the exercise of statutorily-granted peremptory challenges.

Return, Ex. A at 18–19. It is clear from this summary that Williams raised the issue of the misuse of *Batson*, and it is clear from its opinion that the Indiana Supreme Court understood the claim to require reference to *Batson* and other constitutional cases, as they addressed *Batson* and its progeny in their opinion at length. Thus, this court finds the issue to be fairly presented to the Indiana Supreme Court.

■ Respondent asserts that the Indiana Supreme Court's opinion rests on adequate and independent state law grounds because the court held that the trial court acted within its discretion to manage the proceedings to protect potential jurors from racial discrimination and that the trial court did not abuse its discretion in determining that Williams' reasons for challenging the jurors was inadequate. Under *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), adequate and independent state grounds bar the merits review of a federal issue only if the state court did not decide a federal issue because of a state substantive or procedural law. The state law ground must be both independent of the merits of the federal question and adequate to support the judgment of the state court. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). If the

state court decision "fairly appears to rest on federal grounds or is interwoven with federal law," it has not been procedurally defaulted. *Willis v. Aiken*, 8 F.3d 556, 561 (7th Cir.1993). In this case, the court's analysis and holding are replete with references to *Batson* and the equal protections rights embodied in that opinion. Additionally, the court does not make the plain statement that it is deciding the issue solely on state law grounds, as required by *Harris*. While the Indiana Supreme Court certainly considered "the trial court's inherent authority to manage and control proceedings," it considered that authority within the context of *Batson*, and its ultimate ruling was based on its reading of *Batson*. Thus, this issue has not been procedurally defaulted.

Having found the issue to be properly presented, this court must now determine whether the Indiana Supreme Court's decision is contrary to or an unreasonable application of clearly established federal law, as required by 28 U.S.C. § 2254. A review of the applicable Supreme Court precedent is appropriate.

In *Batson*, the Supreme Court recognized that the use of peremptory challenges by prosecutors to excuse jurors of the same race as the defendant violated the equal protection rights of both the defendant and the challenged juror. 476 U.S. at 86–87, 106 S.Ct. 1712. The court thus articulated a test for challenging discriminatory peremptory strikes. *Id.* at 96–98, 106 S.Ct. 1712. Specifically, the court held that when a defendant challenges a peremptory strike as discriminatory, he must first make a prima facie case of discrimination, showing that he was a member of a recognized minority, that the prosecutor was challenging a potential juror who was also a member of that minority, and other facts which might give rise to the inference that the prosecutor was challenging the juror solely on the basis of his

race. *Id.* at 96, 106 S.Ct. 1712. Once the defendant made this showing, the burden then shifted to the prosecutor to "articulate a neutral explanation related to the case to be tried" which must be a " 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenge." *Id.* at 98 and n. 20, 106 S.Ct. 1712, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The trial court then has the "duty to determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. 1712. Following *Batson*, the Supreme Court extended this analysis to situations where the prosecution attempted to strike African–Americans where the defendant was white, *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); where either party attempted to strike jurors due to race in civil cases, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); and where a white defendant attempted to strike African–American jurors in a criminal case, *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

In *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the court again set out its process for evaluating *Batson* claims as follows:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [*Batson* ] at 96–97, 106 S.Ct. 1712. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97–98, 106 S.Ct. 1712. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98, 106 S.Ct. 1712.

500 U.S. at 358–59, 111 S.Ct. 1859. The court then noted that "[a] neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.... Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360, 111 S.Ct. 1859. The *Hernandez* court then quoted the *Batson* opinion, explaining that "[s]ince the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* at 364, 111 S.Ct. 1859, quoting *Batson,* 476 U.S. at 98, n. 21, 106 S.Ct. 1712.

Finally, in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the Supreme Court explained that "[t]he second step of [the *Batson* ] process does not demand an explanation that is persuasive, or even plausible," and held that the Court of Appeals had erred by requiring that "the justification tendered at the second step be not just neutral but also at least minimally persuasive." 514 U.S. at 768, 115 S.Ct. 1769. The court went on to explain that "to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* The court explained the term "legitimate reason" from *Batson* as "not a reason that makes sense, but a reason that does not deny equal protection." *Id.* at 769, 115 S.Ct. 1769.

■ Williams argues that the Indiana Supreme Court's decision is both contrary to and an unreasonable application of clearly established federal law because 1) the decision presumes illegal racial discrimination as motivation for peremptory challenges and thereby shifts the burden of production to Williams without the requisite prima facie showing required by *Batson* and *McCollum;* 2) the decision applies the wrong standard in determining whether Williams' explanations are race-neutral in violation of *Purkett;* and 3) the decision improperly shifts the entire burden of persuasion to Williams to prove his motivation was not illegal discrimination. In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the United States Supreme Court articulated its rule that the deliberate exclusion of jurors on the basis of their race is a violation of the Equal Protection Clause. 380 U.S. at 204, 85 S.Ct. 824. It added, though, that peremptory challenges are presumed to be unbiased, and required that defendants show a systematic exclusion of jurors of a particular race over a number of cases before the court would find the presumption overcome. *Id.* at 222, 224, 85 S.Ct. 824. *Batson* overruled *Swain* in allowing the court to find an equal protection violation based solely on the use of peremptory challenges in a specific case, but it still required that the defendant show a prima facie case of discriminatory use of peremptory challenges before the prosecutor was required to articulate a race-neutral explanation. 476 U.S. at 95, 106 S.Ct. 1712. None of the cases between *Batson* and *Purkett* suggested that the prima facie case was not required, and *Hernandez,* which was relied upon by the trial court and the Indiana Supreme Court, explicitly set out the test, including the prima facie case requirement.

With respect to *Purkett,* the respondent argues that the Indiana Supreme Court acted appropriately in not applying *Purkett* to this case because it was decided after Williams' trial. *See Williams,* 669 N.E.2d at 1380, n. 6. However, in *Griffith v. Ken-*

*tucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the United States Supreme Court explained that new rules of criminal prosecution from the Supreme Court should be applied retroactively not only when the rules are applying settled precedent to different factual settings or when the trial court lacked authority to convict in the first place, but also when the new rule is a clear break with previously established law, as long as the convictions are not final, meaning that they are still on direct review. 479 U.S. at 328, 107 S.Ct. 708. *Griffith* specifically required that the Kentucky Supreme Court apply *Batson* to cases where direct review was still pending at the time *Batson* was announced. *Id.* Clearly *Purkett,* an extension of *Batson,* should have been applied to Williams' case, which was pending before the Indiana Supreme Court when *Purkett* was issued.

Finally, the respondent asserts that the Indiana Supreme Court properly deferred to the trial court's factual findings under *Hernandez* in determining that the proffered explanations were not "sufficiently clear and reasonably specific." 669 N.E.2d at 1381. However, neither the trial court nor the Indiana Supreme Court made any finding regarding the discriminatory intent needed for a prima facie case, nor did they explain how the proffered explanations were pretexts for discrimination, as required by *Purkett.*

There is no doubt that the values that are embedded in the decision of the Supreme Court of the United States in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) are very important and indeed fundamental. But that decision and its aftermath have created very real and difficult problems for state and federal trial judges who preside in criminal cases. Trial of a criminal case under Amendment VI of the Constitution of the United States, as well as the provision in Article III of that Constitution,

remains an adversary proceeding in which, in this case, state law provisions giving a defendant charged in a capital case a statutory number of peremptory challenges in jury selection remain important. In Indiana, the statute guarantees 20 such peremptory challenges in criminal cases where the death penalty is sought. The selection of a jury to try a state criminal case is a difficult and delicate judicial function. Compliance with the *Batson* decision is only one of numerous problems that a state trial judge faces during the voir dire in a state criminal case. For example, this species of criminal case is generally the only one which the jury is advised of the maximum penalty from the get-go. One of the many realities are that when the death penalty is on the table, extraordinary care is required during the voir dire process. However, as Justice O'Connor has pointed out, the process is still an adversarial one and the case law, including *Batson* and the cases that followed it, make it clear that *Batson* issues must be raised. *Batson* is not self-executing. The veteran and able state criminal court judge in this case was confronted with some very difficult problems, not the least of which may have been an effort to work out the proper application of the *Batson* doctrine.

It is easy to gainsay the procedures he adopted now years later and after review by the Supreme Court of Indiana. But the procedures that he adopted in this case did not find favor with the Supreme Court of Indiana, and neither did similar procedures followed by this same state court judge in other cases decided by the Supreme Court of Indiana. The state court trial judge literally jumped over some very important prerequisites under *Batson* in setting the procedures for the exercise of challenges by both the prosecution and the defense. Certainly, great leeway must be granted to state court judges who are on the firing line unless the Constitution of

the United States is clearly implicated as it must be to give this Court the necessary jurisdiction to review this case. It is with considerable reluctance that this Court has determined that the manner in which the state court trial judge attempted to deal with the subject of peremptory challenges is·at odds with the constitutional teaching of *Batson* and its progeny in the Supreme Court of the United States.

It is also specifically important to understand that this Court can and does in this proceeding take into account ·the decision of the Supreme Court of the United States in *Purkett,* decided after the trial of this case, but before the appeal was decided by the Supreme Court of Indiana, witnessed by the reference to the case in the footnote at 669 N.E.2d at 1380, n. 6. When the composite effect of this line of cases, beginning with *Batson,* running through *Hernandez,* to *Purkett,* this Court cannot escape the conclusion that the Constitution of the United States was implicated and indeed·violated. The Great Writ must be **GRANTED** conditioned on the State of Indiana retrying this case in 120 days.

### IV. Ineffective Assistance of Trial Counsel

Williams next asserts that he is entitled to relief under 28 U.S.C. § 2254 because he received ineffective assistance of trial counsel in violation of the Sixth Amendment and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on this claim, Williams must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the· acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in

light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. There is no question after *Williams v. Taylor* that *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams,* 120 S.Ct. at 1512.

■ The Superintendent first asserts that some of Williams' claims of ineffective assistance are barred by procedural default. Specifically, he argues that Williams failed to present his arguments that his counsel was rendered ineffective by the trial court's peremptory challenge procedure and by the trial court's use of a psychological questionnaire as issues of ineffective assistance to the Indiana Supreme Court. This court agrees that these issues were not framed in the context of ineffective assistance of counsel before the Indiana Supreme Court and finds them defaulted. *See Boerckel,* 526 U.S. at 844, 119 S.Ct. 1728.

Respondent argues that the remainder of Williams' ineffective assistance claims are barred by procedural default because they were decided on adequate and independent state law grounds. Williams·· claimed that the trial court's limiting the mitigation expert to 25 hours and denying the defense's motions for continuance rendered his counsel ineffective. The Indiana Supreme Court held that under Indiana Criminal Rule 24(C), the trial court's limitation on the mitigation expert was an abuse of discretion, but that it was not reversible error because the psychologist

testified to many of the things that the mitigation expert would have presented. 669 N.E.2d at 1384. Additionally, because the jury failed to reach a recommendation, Williams was not prejudiced by the limitation. *Id.* at 1385. The court explained that Criminal Rule 24 was a codification of a number of Indiana cases which relied on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). *Id.* at 1383. The court held that the denial of Williams' motions for continuance was not reversible error because he was not prejudiced because the jury failed to reach a recommendation. *Id.* at 1386. Although the Indiana Supreme Court did not address these claims specifically under federal law, they did allude to federal law, and the issues were presented to the court as violations of the Sixth Amendment. Therefore, this court finds that the issues were not disposed of on independent and adequate state law grounds and must be addressed on the merits.

Williams claims that his counsel were ineffective during the guilt phase because they failed to interview, investigate or depose any of the state's witnesses and during the penalty phase because they failed to adequately prepare or present the mitigation evidence regarding Williams' childhood. The Indiana Supreme Court found that with respect to the guilt phase, Williams' counsel effectively cross-examined some of the witnesses, and other potential witnesses would not have provided relevant evidence. 724 N.E.2d at 1077. Similarly, during the penalty phase, Williams' counsel did present the testimony of Dr. Caruana, who discussed Williams' childhood in some detail, and were able to persuade enough jurors to keep them from making a recommendation. *Id.* at 1078. Thus the court found that Williams' counsel had not provided deficient performance and had not prejudiced him. *Id.*

■ Williams argues that his counsel did no more for him than did trial counsel in *Miller v. Anderson,* 255 F.3d 455 (7th Cir.2001), which the Seventh Circuit held to be deficient performance. Even if the performance by Williams' counsel here falls below an objective standard of reasonableness, though, he has still failed to show any prejudice from that failure. Williams has not shown any evidence in the post-conviction process which "show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Taylor,* 529 U.S. at 390, 120 S.Ct. 1495. None of the evidence proffered regarding the guilt phase seems likely to have changed the verdict, as it remains uncontested that Williams in fact shot the three victims. Williams argues that a more effective mitigation presentation might have swayed either the jury or the judge, but the Indiana Supreme Court determined on direct appeal that "the defendant presented effectively to the jury during the penalty phase and to the court at sentencing all those aspects of defendant's background, character or record and those circumstances of the offense that could have been proffered as a reasonable basis for imposing a sentence other than death," and after considering the additional evidence presented during post-conviction relief, that court was not persuaded that additional mitigation evidence would have made a difference. 724 N.E.2d at 1078. This court finds that the Indiana Supreme Court's decision on this issue was not an unreasonable application of *Strickland,* and thus Williams is not entitled to relief on this ground. *See Todd v. Schomig,* 283 F.3d 842 (7th Cir.2002).

## V. Prosecutorial Misconduct

Williams next claims that the prosecution failed to disclose evidence which was favorable to the defense. Specifically,

Williams complains that the prosecution knew or should have known of the medical records of Jeanette Williams, which showed that she was regularly using crack cocaine around the time that Williams confessed his role in the crimes to her, that she suffered blackouts, memory loss, and hallucinations from her drug use, and that she had a long history of depression due to her chaotic upbringing, her father raping her, several failed suicide attempts and the loss of her seven children to the welfare department. Williams claims the state exacerbated its failure by suggesting that Jeanette was hospitalized for depression resulting from having to testify against her brother, rather than drug and alcohol dependency. Williams also asserts that the state failed to disclose that Runny Gill, Jeanette's boyfriend, received reward money from Crime Stoppers after Jeanette testified, that the state failed to disclose the information it received from jailhouse informant Gerald Knopic, failed to disclose a statement made by Lanita Charleston, failed to disclose the criminal history of Mark Harris, and failed to disclose the criminal history of one of the victims and the sexual reputation of another of the victims.

■■■■ Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. 1194. To succeed on a claim under *Brady,* Williams must show that the prosecutor suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material. *Abbott v. United States,* 195 F.3d 946, 948 (7th Cir.1999). To determine whether the evidence was material, a court must consider whether, in the absence of the evidence, the defendant received a fair trial resulting in a verdict worthy of confidence. *Kyles v. Whitley,*

514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). To prove a claim of prosecutorial misconduct, petitioner must show that the prosecutor committed misconduct and that the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In determining whether a denial of due process occurred, this court can consider whether the prosecutor misstated the evidence, whether the remarks implicate specific rights of the accused, whether the defense invited the response, the trial court's instructions, the weight of the evidence against the defendant, and the defendant's opportunity to rebut. *Id.* at 181–82, 106 S.Ct. 2464.

The Indiana Supreme Court determined that because the state did not have Jeanette Williams' medical records, there was no evidence to support Williams' claim that the state committed misconduct by withholding the records from Williams. 724 N.E.2d at 1081. Nor did the court find that the state had committed prosecutorial misconduct in presenting evidence that Jeanette Williams was being hospitalized for depression due to having to testify against her brother, since Jeanette answered affirmatively that having to testify against her brother was a partial cause of her depression. *Id.* The court held that the evidence regarding Hollins' criminal history and Richardson's "sexual proclivities" was inadmissible and thus the state did not commit misconduct in failing to share it with Williams. *Id.* at 1081–82. Likewise, the court found the evidence regarding Mark Harris' criminal history to be inadmissible and thus the failure to disclose it did not place Williams in grave peril. *Id.* at 1082. The court held that the information provided by the jailhouse informant was so ambiguous as to be unlikely to make any impact on the jury. *Id.*

The court held the failure to disclose the informants' rewards was not "sufficiently probative to satisfy the materiality standard in [*United States v.*] *Bagley*, [473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)]." *Id.* at 1083. Finally, the court held that the failure to turn over statements made by Williams himself and by Lanita Charleston did not constitute misconduct because Williams did not show how the statements constituted misconduct. *Id. See also, Todd v. Schomig,* 283 F.3d at 848.

This court has considered the evidence which forms the basis of this claim, and it finds that the decision of the Indiana Supreme Court is not contrary to or an unreasonable application of *Brady*. Therefore, no relief will be granted on this claim.

## VI. Psychological Questionnaire

 Williams claims that his rights to due process and equal protection were violated when the trial court judge had a psychological profile secretly compiled on petitioner and relied on that profile in determining petitioner's sentence, rendering the sentence unreliable. Prior to sentencing, Judge Letsinger had the probation department prepare a psychological profile of Williams. Judge Letsinger testified that the questionnaires were routinely attached to the pre-sentence investigation report, and Williams' counsel received a copy of the questionnaire. P.C.R. 1507–09, 1512. After the post-conviction proceedings had been concluded and while Williams' denial of post-conviction relief was on appeal, counsel discovered the questionnaire and petitioned the Indiana Supreme Court to consider the effects of the questionnaire on Williams' sentence. The Indiana Supreme Court had previously addressed the issue of Judge Letsinger's questionnaires in *Matheney v. State,* 688 N.E.2d 883 (Ind.1997) and had determined that an independent review of the aggravating and mitigating circumstances

to determine if the sentence was appropriate would be the appropriate course. The court conducted the same review in Williams' case and determined that the aggravating factors outweighed the mitigating circumstances, without reference to the psychological questionnaire, and thus upheld the sentence. 724 N.E.2d at 1079.

This court has also reviewed Judge Letsinger's psychological questionnaire in *Matheney v. Anderson,* 60 F.Supp.2d 846, 865 (N.D.Ind.1999), *aff'd.* 253 F.3d 1025 (7th Cir.2001), and found it to pass constitutional muster. Under *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), a defendant has the right to hear all information used in the capital decision making process. Specifically *Gardner* banned the use of an undisclosed pre-sentence questionnaire by the sentencing judge in imposing a death sentence. *Id.* at 363, 97 S.Ct. 1197. In both *Matheney* and this case, the Indiana Supreme Court found that Judge Letsinger did not actually rely on the questionnaire in imposing the death sentence. 706 N.E.2d at 162, n. 9. Furthermore, the Indiana Supreme Court independently weighed the aggravating and mitigating circumstances and determined that the sentence was supported by the evidence without reference to the questionnaire. *Id.* at 162. As in *Matheney v. Anderson,* this court finds no Constitutional error in process, given the Indiana Supreme Court's independent review of the sentence. Thus, this court will deny habeas relief on this issue.

## VII. Limitation of Experts

 Williams argues that the trial court's limitation of his mitigation expert to twenty-five (25) hours and his failure to appoint a psychological consultant until four days before trial constitute a violation of *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake,* the Supreme Court wrote that:

We recognized long ago access to the courthouse doors does not by itself assure a proper functioning of the advocacy process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to raw material integral to the building of an effective defense.... [This Court] has often reaffirmed that fundamental fairness entitles indigent defendants to an "opportunity to present their claims fairly within the adversary system."

470 U.S. at 77, 105 S.Ct. 1087, quoting *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). Williams argues that the trial court's limitation on his experts denied him the ability to fairly present his claims.

The respondent first argues that this claim has been procedurally defaulted because the Indiana Supreme Court decided it on independent and adequate state law grounds. The Indiana Supreme Court discussed several state and federal cases before explaining that the principles had been codified in Indiana Criminal Rule 24(C)(2), which provides as follows:

Counsel appointed in a capital case shall be provided with adequate funds for investigative, expert, and other services necessary to prepare and present an adequate defense at every stage of the proceeding, including the sentencing phase. In addition to the hourly rate provided in this rule, all counsel shall be reimbursed for reasonably incidental expenses as approved by the court of appointment.

669 N.E.2d at 1383–84, quoting Ind. Crim.R. 24(C)(2). The court found that the trial court had not violated Rule 24 with respect to the appointment of the psychologist, since he approved the appointment the day it was requested. *Id.* at 1384. The court held that Rule 24 had

been violated with respect to the limitation on the mitigation specialist, but found that the error was not reversible because Williams had presented a "substantial mitigation case" despite the limitation. *Id.* Under *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), adequate and independent state grounds bar the merits review of a federal issue only if the state court did not decide a federal issue because of a state substantive or procedural law. The state law ground must be both independent of the merits of the federal question and adequate to support the judgment of the state court. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). If the state court decision "fairly appears to rest on federal grounds or is interwoven with federal law," it has not been procedurally defaulted. *Willis v. Aiken,* 8 F.3d 556, 561 (7th Cir.1993). In this case, the court not only discussed *Ake* prior to its discussion of Rule 24, but also referred to *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) in its conclusion. It appears that the court's decision was at least interwoven with federal law and thus the issue is not defaulted.

■ Under the Fifth Amendment and *Ake,* indigent defendants are guaranteed "a fair opportunity to present their defense at trial" but does not entitle them to "all the assistance a wealthier counterpart might buy." *United States v. Kennedy,* 64 F.3d 1465, 1473 (10th Cir.1995)(citing *Ake,* 470 U.S. at 76, 105 S.Ct. 1087). *Ake* provides three factors to determine what assistance is required: 1) the effect on the defendant's interest in the accuracy of the trial without the requested assistance; 2) the burden on the government's interest if the assistance is provided; and 3) the probable value of the additional assistance

and the risk of error without the assistance. 470 U.S. at 78–79, 105 S.Ct. 1087.

With respect to Dr. Caruana, no *Ake* violation occurred because he was appointed as soon as Williams requested him and because he testified at post-conviction that the additional information he learned during post-conviction did not change his assessment. P.C.R. 3330. With respect to the mitigation specialist, the Indiana Supreme Court held that although the limitation was an abuse of discretion, it was not reversible error because Williams was still able to present a substantial mitigation case. 669 N.E.2d at 1384–85. Although their opinion did not specifically address the *Ake* factors, its ultimate conclusion focuses on the third factor in the *Ake* test, and when presented additional mitigation evidence during post-conviction review, the court reaffirmed its conclusion that additional investigation would not have affected the outcome of Williams' trial. 724 N.E.2d at 1078. This court does not find the Indiana Supreme Court's determination to be an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, and thus it will not grant relief on this issue under 28 U.S.C. § 2254.

### VIII. Conclusion

For the reasons stated above, the court now **GRANTS** relief under 28 U.S.C. § 2254 with respect to the peremptory challenge claim and **DENIES** relief on all other claims. The writ of habeas corpus is now issued, conditioned upon retrial or release within 120 days of this order.

**IT IS SO ORDERED.**